**SECURITIES & EXCHANGE COMMISSION, Appellant,**

v.

**WALL STREET PUBLISHING INSTITUTE, INC., d/b/a Stock Market Magazine.**

No. 86–5646.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1987.

Decided June 21, 1988.

Richard A. Kirby, Asst. Gen. Counsel, S.E.C., with whom Daniel L. Goelzer, General Counsel, Jacob H. Stillman, Associate General Counsel and Paul Gonson, Sol., S.E.C., were on the brief, for appellant. Leslie E. Smith, Attorney, S.E.C., Washington, D.C., also entered an appearance for appellant.

Joseph H. Sharlitt, Washington, D.C., for appellee.

Before SILBERMAN and D.H. GINSBURG, Circuit Judges, and McGOWAN,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

This appeal occasions our second review of efforts by the Securities and Exchange Commission to enjoin certain practices of Stock Market Magazine and its corporate parent, Wall Street Publishing Institute, Inc. ("WSPI"). At issue here is the SEC's request, under the anti-touting provisions of the Securities Act of 1933, 15 U.S.C. § 77q(b) (1982), for an injunction that would require the magazine to disclose consideration received in exchange for publishing articles that feature particular firms' securities. The district court denied the requested injunction, characterizing it as a prior restraint prohibited by the First Amendment, 664 F.Supp. 554. We disagree (although not entirely) with the district court's analysis, and so reverse its decision and remand the case for further proceedings to determine whether the requested injunction should issue.

## I.

WSPI publishes Stock Market Magazine, a twenty-two year old publication directed to small investors, ten times annually. A few clerical and part-time employees assist with production, but the magazine essentially is a two-person operation, consisting of WSPI's President, Angelo R. Martinelli, who oversees the business end of the publication, and Bernard D. Brown, the Managing Editor.

Despite its limited staff, Stock Market Magazine has attracted a circulation of 15,000, including some 12,000 subscribers. According to a 1982 Stock Market Magazine subscribers' survey, 98% of its readers own securities, with 70% owning securities valued at more than $15,000 and 44% owning securities valued at more than $25,000. The magazine offers its readers financial news in two forms: the first is comprised of the magazine's independently written articles, which offer financial news of general interest, and columns on topics that range from personal finance to national

* Judge McGowan concurred in the judgment but died before this opinion issued.

politics; the second encompasses longer feature articles, which focus primarily on individual companies.

Each issue typically contains seven or eight feature articles that profile an individual firm, and these articles uniformly portray the subject firm as an appealing investment prospect because of its market position, product offering, or management strategy. Indeed, the articles describe the featured companies in unabashedly glowing terms, as any selection of headlines suggests,[1] and usually include a review of the performance and prospects of the companies' securities. We are told they never contain a negative report, or even reflect mild skepticism, concerning the featured companies or their stock.

According to the SEC and several of its discovery deponents, the articles' lack of editorial balance is not accidental, but is a consequence of the various arrangements by which they come to be written. Some articles are written by the featured company itself, submitted to the magazine, and published substantially as submitted. Others are written by public relations firms paid by the featured companies. And on occasion, the contributing editors of the magazine or Brown himself write articles on a freelance basis. Then also, the writers' fees are paid not by the magazine but by the featured companies. None of these arrangements can be discerned from the firm's masthead, which describes the publicist-writers as contributing editors, and hold out the feature articles as "based on thorough research and first-hand inter-

views with company officials, economists, security analysts, tax accountants, and other experts."[2]

In addition to writers' fees and other amenities, such as free office space, that the featured companies or their publicists provide to Stock Market Magazine's writers, the company articles also appear directly to generate revenue for WSPI. Featured companies regularly purchase article reprints, which are available only through the magazine, and advertising space, which Brown encourages them to place in issues other than the one in which the company article appears, to avoid "unseemliness."

These practices attracted the attention of the SEC, which initiated a civil suit against WSPI under four separate provisions of the federal securities laws on July 19, 1982.[3] Among other allegations, the SEC maintained that the provision of free text (whether directly from the company or a public relations firm), writers' fees, advertising purchases, and reprint orders was a *quid pro quo* for the magazine's publication of the feature articles, and that failure to disclose this consideration violated section 17(b) of the Securities Act of 1933, 15 U.S.C. § 77q(b), which prohibits publishing a description of a security in exchange for undisclosed consideration.[4]

After extensive discovery, the parties filed cross motions for summary judgment in the district court and the SEC prevailed. The district court issued a permanent injunction, requiring WSPI to register as an investment adviser and barring further violations of the securities laws. *SEC v.*

---

1. *E.g.*, Andrews, *Health Chem's Insect Trap Holds High Profit Potential*, Stock Market Mag., Oct. 1978, at 20; Brennan, *Chyron Corporation: Growing Steadily in Television Graphics Equipment*, Stock Market Mag., June 1984, at 20.

2. The magazine discontinued this claim during the pendency of this litigation, but none of the changes in practice undertaken by the magazine is relevant to the disposition of this appeal.

3. The complaint alleged violations of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b–3, 80b–6; the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); and the Securities Act of 1933, 15 U.S.C. § 77q(b); and sought an injunction restraining WSPI from further violations.

4. Section 17(b) provides as follows:

    It shall be unlawful for any person, by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, to publish, give publicity to, or circulate any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

    15 U.S.C. § 77q(b).

*WSPI,* 591 F.Supp. 1070, 1090 (D.D.C.1984). The injunction included a provision tracking the language of section 17(b). Declining to resolve the dispute as to whether reprint orders functioned as a *quid pro quo* for publication of the company articles, the court held that the writers' fees were consideration, and that failure to disclose them violated section 17(b). *Id.* at 1089. WSPI appealed, but this court held the appeal in abeyance pending decision by the Supreme Court of a case presenting similar issues under the Investment Advisers Act, *Lowe v. SEC,* 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985).

*Lowe* involved a First Amendment challenge to an injunction completely prohibiting publication of a newsletter containing nonpersonalized investment advice and commentary. The injunction issued under the same provisions of the Investment Advisers Act, 15 U.S.C. §§ 80b–3 and 80b–6, that had, in part, supported the district court's order against WSPI. The Supreme Court, avoiding the constitutional challenge, construed a statutory exclusion for "the publisher of any *bona fide* newspaper, news magazine or business or financial publication of general and regular circulation" to include the defendant's investment advice newsletter. 472 U.S. at 204–07, 105 S.Ct. at 2570–72. In light of *Lowe,* but without consideration on the merits, we remanded this case to the district court for reconsideration.

On remand, the SEC abandoned its claims under the Investment Advisers Act, but continued to press its claims under section 17(b) and under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The district court refused relief on either claim, holding as to the latter that "Stock Market Magazine's representations are not 'in connection with the purchase or sale of a security,'" as required by the statute, and therefore section 10(b) "simply

does not apply." *SEC v. WSPI,* 664 F.Supp. 554, 556 (D.D.C.1986) (August Order). The SEC has not appealed the district court's dismissal on remand of the section 10(b) charges.

With respect to the claims based on section 17(b), the district court concluded that "by designating publications such as Stock Market Magazine as *bona fide* publications entitled to First Amendment rights," the Supreme Court's decision in *Lowe* precluded a civil remedy for the statutory violation. The district court held:

> Although [the SEC] claims that in seeking injunctions which track the language of the Securities Exchange Act and the Securities Act it is not seeking to enjoin the publication of Stock Market Magazine, the effect of such an Order is clearly a prior restraint which violates the First Amendment. Although the Court's Order does not forbid publication entirely, it does place qualifications on publication which, if violated, could lead to punishment for contempt.... [I]t is the injunction itself, which threatens this punishment before the fact of publication, which violates the First Amendment.

August Order at 556.

Asserting that "[t]he SEC may still bring a criminal action against [WSPI] under section 17(b) if it can show that [the] violations were willful," *id.* at 556, the district court refused the requested injunction and dismissed the SEC's complaint. This appeal, limited to the issues presented under section 17(b), followed.

## II.

### A.

In support of the district court's judgment, WSPI argues that section 17(b) does not apply at all to Stock Market Magazine's company articles.[5] According to WSPI, the

---

5. The Commission complains that this argument was not presented to the district court and aptly notes our refusal to address issues raised for the first time on appeal. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Kassman v. American Univ.,* 546 F.2d 1029, 1032 (D.C.Cir.1976) (per curiam).

However, in light of our obligation to avoid unnecessary adjudication of constitutional claims when a statute's language or legislative history admits of a limiting construction, *Ashwander v. TVA,* 297 U.S. 288, 341–56, 56 S.Ct. 466, 480–87, 80 L.Ed. 688 (1936) (Brandeis, J., concurring), we may consider this argument.

sole purpose of the Securities Act of 1933 is to ensure adequate disclosure of information at the time securities are first sold to the public; therefore, section 17(b) should be read to apply only to original distributions of securities subject to section 5 of the Securities Act of 1933, 15 U.S.C. § 77e.

WSPI argues that the terms "issuer, underwriter and dealer," when used together, refer exclusively to original distributions of securities regulated by section 5, and asserts that "[n]owhere in the 1933 Act did Congress use the term 'issuer' outside the distribution context." Relying on excerpts from the legislative history of section 5, none of which refer or pertain to section 17(b), and on a selective and tenuous comparison of statutory language, WSPI concludes that section 17(b) applies only to a publication that describes a security that is part of an original distribution and not to those traded only in the securities aftermarket. If WSPI is correct, the statute cannot support an injunction against Stock Market Magazine because the company articles do not describe original distributions of stock.

The Commission contends that Congress' purpose extends beyond original distributions, and that its use of the terms "issuer, underwriter or dealer" simply (and sensibly) limits the disclosure requirement to consideration received from those who have a financial interest in fraudulently presenting promotional literature as objective reporting. The SEC thus argues that WSPI's construction is incompatible with the broad language of the statute and with relevant portions of the principal committee reports on the 1933 Act.

The language of section 17(b), *supra* note 4, does not readily lend itself to the restrictive construction urged by WSPI.

*See Meredith Corp. v. FCC,* 809 F.2d 863, 872 (D.C.Cir.1987).

**6.** These statements are not explicitly tied to section 17(b), but they do refer to deceptive practices. This reference necessarily includes section 17(b), which the House Report described as

By its terms, the statute applies to "any" person who publishes "any" article which, "though not purporting to offer a security for sale, describes such security for a consideration received ..., directly or indirectly, from an issuer, underwriter, or dealer" without disclosing the consideration. 15 U.S.C. § 77q(b). Nothing in this language suggests that Congress intended to limit the class of "securit[ies] for sale" subject to this provision to original distributions, as it did when it established the registration requirements in the same statute. *See* 15 U.S.C. § 77e.

The plain language of the statute thus appears to be dispositive of WSPI's contention, but even if an alternative reading were possible, we think it foreclosed by the legislative history. The Senate Committee Report emphasized that violations of the statute "may be prosecuted regardless of whether the security is old or new." S.Rep. No. 47, 73d Cong., 1st Sess. 4 (1933). The House Committee Report also indicated that the provisions would apply whether the securities involved were "new or already outstanding." H.R.Rep. No. 85, 73d Cong., 1st Sess. 6 (1933).[6] Such a clear statement of purpose in the principal committee reports must be given effect when it accords with the interpretation urged by the agency administering the statute. *See Miller v. FMSHRC,* 687 F.2d 194, 195 (7th Cir.1982). WSPI's statutory argument is too unpersuasive to be adopted even to avoid reaching the constitutional claims presented. *See Lowe,* 472 U.S. at 212, 105 S.Ct. at 2574 (White, J., concurring), quoting *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932) (construction must be "fairly possible" to avoid a constitutional issue).

"particularly designed to meet the evils of the 'tipster sheet,' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for." House Report at 24. *See United States v. Amick,* 439 F.2d 351, 365 (7th Cir.1971).

### B.

The district court denied the injunction,[7] on grounds that it would operate as a prior restraint, holding that the SEC had failed to satisfy the extraordinary showing of potential danger that must support any such restraint. August Order at 556, relying on *New York Times Co. v. United States,* 403 U.S. 713, 726–27, 91 S.Ct. 2140, 2148, 29 L.Ed.2d 822 (1971) (Brennan, J., concurring) (publication must "inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea" before restraint is permissible). According to the court, "[t]he fraud committed by [WSPI] in this action does not even arguably reach this level of danger. Therefore, the injunction sought by the SEC would be unconstitutional." August Order at 556.

■ The Commission contends that the prior restraint doctrine is the wrong analytical framework for a *disclosure* requirement if imposed only after full judicial review on the merits. We agree. The Supreme Court has never held that all injunctions affecting a newspaper's publication are impermissible, or that all must satisfy the standard applied to prior restraints. "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973). Orders that are carefully focused, address a continuing course of speech, and are imposed after an opportunity for full merits consideration are not properly analyzed as prior restraints. *Id.* at 390–91, 93 S.Ct. at 2561–

62; *Vance v. Universal Amusement Co.,* 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980) (per curiam); Redish, *The Proper Role of the Prior Restraint Doctrine in First Amendment Theory,* 70 VA.L.REV. 53, 55, 58 (1984).

In *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) and *Vance v. Universal Amusement Co.,* 445 U.S. 308, 100 S.Ct. 1156, 63 L.Ed.2d 413 (1980), for example, "the state made the mistake of prohibiting future conduct after a finding of undesirable present conduct." *Id.* at 311 n. 3, 100 S.Ct. at 1159 n. 3. That approach raises the distinct possibility that future speech, fully entitled to First Amendment protection, would nevertheless be enjoined. Here however, the SEC is not requesting an injunction against future articles, as yet unconsidered by any court. Rather, it requests an injunction against a continuing practice of publishing feature articles without disclosure of consideration. The propriety of such an injunction is fully capable of being judged now, and is constitutionally permissible, as we explain, if, but only if, it does not chill or prohibit protected speech in the future.

In sum, the prior restraint doctrine is not precisely applicable to the requested relief in this case. Our view is supported by Justice White's concurring opinion in *Lowe,* joined by two other justices, which undertook the First Amendment analysis avoided by the majority in that case. 472 U.S. at 227–236, 105 S.Ct. at 2582–2587. Justice White agreed that the injunction before the court, which banned publication of an investment newsletter altogether, could not stand. "Such a flat prohibition or prior restraint on speech," in his view, "is, as applied to fully protected speech, presump-

---

**7.** The pertinent part of the requested injunction, which the district court granted in its first decision, reads as follows:

[ORDERED], that Wall Street Publishing Institute, Inc., its officers, directors, agents, servants, attorneys, employees, successors and assigns, and those persons in active concert or participation with them, are permanently restrained and enjoined from making use of any means or instruments or communications in interstate commerce or by the use of the mails, publishing, giving publicity to, or circu-

lating any notice, circular, advertisement, newspaper, article, letter, investment service, or communication[ ] which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received directly or indirectly from, an issuer, underwriter or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

*SEC v. WSPI,* 591 F.Supp. 1070 (D.D.C.1984) (order granting permanent injunction).

tively invalid." *Id.* at 234, 105 S.Ct. at 2586. The opinion took particular care to state, however, that a more limited injunction, particularly an order "to require investment advisory publishers to disclose material facts," *id.* at 225, 105 S.Ct. at 2581, might be constitutionally permissible, depending on the level of protection, if any, the First Amendment provided to the speech in question.

### III.

The district court, concluding that the *Lowe* decision "designat[ed] publications such as Stock Market Magazine as *bona fide* publications entitled to First Amendment rights," August Order at 556, appears to have assumed that *any* injunction would necessarily reach fully protected speech, rather than speech that is subject to more extensive regulation. WSPI defends this conclusion on appeal, and raises the specter that if section 17(b) disclosure requirements can reach protected speech, "it would put the SEC in every newsroom and editorial office in this country."

While it is true that after *Lowe,* the Stock Market Magazine cannot be considered an investment adviser within the meaning of the Investment Advisers Act, we do not think that the feature articles are necessarily immune from all regulation. The district court held that after *Lowe,* a civil remedy for violation of 17(b) was no longer available against a publication comparable to the "bona fide newspapers" exempt from the registration requirements of the Investment Advisers Act. We disagree with this conclusion, for we think the *Lowe* decision is distinguishable on several grounds.

In *Lowe,* the Court was presented with an injunction that absolutely prohibited the petitioner from "publishing nonpersonalized investment advice and commentary in securities newsletters." 472 U.S. at 183, 105 S.Ct. at 2559. Under the registration provisions of the Investment Advisers Act, the SEC could require individuals who provided investment advice to register in accordance with the Act, and could seek injunctions against unregistered persons who gave such advice. As both the opinion of the Court and Justice White's concurrence noted, this aspect of the Investment Advisers Act was basically a scheme for licensing speakers, and as such powerfully implicated the First Amendment, for "[t]he struggle for the freedom of the press was primarily directed against the power of the licensor." *Lowe,* 472 U.S. at 205, 105 S.Ct. at 2570 (quoting *Lovell v. City of Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938)); *see also* 472 U.S. at 229–30, 105 S.Ct. at 2583–84 (White, J., concurring). By contrast, the order requested by the SEC here does not forbid any person from publishing any material at all; it requires instead a disclosure statement when the Stock Market Magazine describes a company's stock in exchange for consideration. In *Lowe,* moreover, no allegations were made that the newsletter "contained any false or misleading information." 472 U.S. at 209, 105 S.Ct. at 2572. Stock Market Magazine's presentation of articles as objective reporting, if in fact the articles are paid for by the company featured, would be inherently misleading. *See Zweig v. Hearst Corp.,* 594 F.2d 1261, 1266–67 (9th Cir.1979). For these reasons, we do not think *Lowe* prohibits the issuance of *any* injunction here.

We therefore need to decide whether 17(b)'s language, prohibiting a "newspaper ... which, though not purporting to offer a security for sale, describes such security *for a consideration* received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt ... of such consideration" (emphasis added), can support an injunction that forces disclosure of "free text," writers' fees, and purchases of advertising and reprints. The parties recognize that the level of constitutional protection to be accorded publications such as Stock Market Magazine, which at least approach general circulation, bears on our interpretation of the statute but vigorously disagree as to what is that level. The SEC characterizes the company articles in Stock Market Magazine as commercial speech, and as such entitled only to the limited

protection that the First Amendment extends to such communications. *See generally Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986). WSPI contends, on the other hand, that the articles cannot be separated from speech that lies at the core of First Amendment interests.

The SEC's position is difficult to reconcile with the contours of the commercial speech doctrine as drawn in Supreme Court opinions. In *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Court described commercial speech as "expression related *solely* to the economic interests of the speaker and its audience," *id.* at 561, 100 S.Ct. at 2349 (emphasis added) and later spoke of the " 'common-sense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech.' " *Id.* at 562, 100 S.Ct. at 2349 (quoting *Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 455–56, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978)). Later, in *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 66–67, 103 S.Ct. 2875, 2880, 77 L.Ed.2d 469 (1983), the Court reiterated the "speech which does no more than propose a commercial transaction" formulation and characterized this language as describing the "core" of commercial speech, thereby suggesting that commercial speech encompasses a somewhat broader area. Then the Court identified three characteristics of commercial speech, while being careful to note that none is necessary or sufficient for speech to be classified as commercial. According to the Court, speech that is *concededly* an advertisement, refers to a specific product, and is motivated by economic interest may properly be characterized as commercial speech. 463 U.S. at 66–67, 103 S.Ct. at 2880.

■ Under the broader formulation of *Youngs Drug,* we are not convinced that the feature articles under consideration here are commercial speech. The articles are not "conceded" to be advertisements, and in fact, are not in an advertisement format. Generally two or three pages long, they are indistinguishable from run-of-the-mill newspaper or magazine stories. Furthermore, while most of the articles specifically mention the company's stock along with its price history, not all do this, and in none is the reference to the company's stock particularly prominent. So, it would be difficult to draw a doctrinal line between these articles and any article that focuses on a particular company.

■ In short, we do not see a clear fit between the commercial speech doctrine and the publications that the SEC here seeks to regulate. And, we are mindful of Justice Stevens' warning in his concurring opinion in *Central Hudson* that "it is important that the commercial speech doctrine not be defined too broadly lest speech deserving of greater constitutional protection be inadvertently suppressed." 447 U.S. at 579, 100 S.Ct. at 2358. It is, in our view, difficult to foresee the implications of applying the doctrine here, and, in any event, we do not believe it is necessary in order to justify regulation. We believe instead that the government may have the power to regulate Stock Market Magazine, not because the articles are "commercial speech," but rather because of the federal government's broad powers to regulate the securities industry.[8] Where the federal government extensively regulates a field of economic activity, communication of the regulated parties often bears directly on the particular economic objectives sought by the government, *see, e.g., NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617–620, 89 S.Ct. 1918, 1941–1943, 23 L.Ed.2d 547 (1969), and regulation of such communications has been upheld. *See NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 912, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982) ("Governmental regulation that has an incidental effect on First Amendment

---

**8.** *See, e.g.,* Securities Exchange Act of 1934, § 14, 15 U.S.C. § 78m (1982) (regulation of proxy solicitation); *id.* § 13, 15 U.S.C. § 78m (regulation of annual reports); Securities Act of 1933, § 5, 15 U.S.C. § 77e (1982) (regulation of stock prospectus); *id.* § 10, 15 U.S.C. 77j (same).

freedoms may be justified in certain narrowly defined instances"; labor and antitrust cases cited as examples); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 150, 87 S.Ct. 1975, 1989, 18 . L.Ed.2d 1094 (1967) (Opinion of Harlan, J.). If speech employed directly or indirectly to sell securities were totally protected, any regulation of the securities market would be infeasible—and that result has long since been rejected. *See, e.g., Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 61–62, 64, 93 S.Ct. 2628, 2637–2638, 2638, 37 L.Ed.2d 446 (1973), and cases cited.

The Supreme Court itself has distinguished between the government's power to regulate "commercial speech" and its powers to regulate the securities industry. In *Dun & Bradstreet, Inc. v. Greenmoss Builders,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), following a discussion of the commercial speech doctrine, the plurality said "[o ]ther areas of the law provide further examples [of permissible regulation]" and included "the exchange of information about securities, [and] corporate proxy statements" as one of those areas. 472 U.S. at 758 n. 5, 105 S.Ct. at 2945 n. 5 (emphasis added). And in *Ohralick v. Ohio State Bar Ass'n,* 436 U.S. 447, 456, 98 S.Ct. 1912, 1919, 56 L.Ed.2d 444 (1978), the Court said "[n]either *Virginia Pharmacy* nor *Bates* [*v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) ] purported to cast doubt on the permissibility of" regulation of the exchange of information about securities.

*Dun & Bradstreet* therefore indicates that securities regulation is a form of regulation distinct from the more general category of commercial speech, and *Ohralik* suggests that the First Amendment protections provided by the commercial speech doctrine do not *detract* from the government's regulatory power over the securities market. In a case decided after the Supreme Court extended First Amendment protection to commercial speech in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the First Circuit observed: "Though first amendment protection has lately been af-forded some types of commercial speech, the first amendment has not yet been held to limit regulation in areas of extensive economic supervision, such as the securities, antitrust, and transportation fields...." *Bangor & A.R.R. v. ICC,* 574 F.2d 1096, 1107 (1st Cir.1978) (citations omitted).

■ The First Circuit spoke long before the Supreme Court's decision in *Lowe,* and after that decision we think it would be an overstatement to assert that the First Amendment does not *limit* regulation in the securities field. We do share the First Circuit's assumption, however, that regulation of the exchange of information regarding securities is subject only to limited First Amendment scrutiny. Speech relating to the purchase and sale of securities, in our view, forms a distinct category of communications in which the government's power to regulate is at least as broad as with respect to the general rubric of commercial speech. Under the commercial speech doctrine, a court judging whether a particular regulation affecting speech is constitutional must determine, among other issues, "whether the asserted governmental interest is substantial." *Central Hudson,* 447 U.S. at 564, 100 S.Ct. at 2350. Here, however, we do not think it necessary for us to inquire, as we would if only commercial speech were involved, whether the government's specific regulatory objective—disclosure of consideration—is constitutionally permissible. In areas of extensive federal regulation—like securities dealing—we do not believe the Constitution requires the judiciary to weigh the relative merits of particular regulatory objectives that impinge upon communications occurring within the umbrella of an overall regulatory scheme. We note, however, that even if we were so required, disclosure requirements have been upheld in regulation of commercial speech even when the government has not shown that "absent the required disclosure, [the speech would be false or deceptive] or that the disclosure requirement serves some substantial government interest other than preventing deception." *Zauderer v. Office of Discipli-*

*nary Counsel,* 471 U.S. 626, 650, 105 S.Ct. 2265, 2281, 85 L.Ed.2d 652 (1985). Indeed, the disclosure provisions of the Foreign Agents Registration Act, requiring that foreign films be labeled "political propaganda," has recently been upheld by the Supreme Court as applied to fully protected speech. *Meese v. Keene,* —— U.S. ——, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987). It is, according to the Court, impermissibly "paternalistic" for courts to challenge such disclosure requirements because "zeal to protect the public from 'too much information' could not withstand First Amendment scrutiny." *Id.* 107 S.Ct. at 1872 (quoting *Virginia Pharmacy Bd.*).[9]

■ Stock Market Magazine's failure to disclose consideration received in return for publication is then, in principle, constitutionally proscribable. Nonetheless, we think we are obliged to consider—no matter how the speech is categorized—whether the government's interpretation of consideration poses the danger that "speech deserving of greater constitutional protection [will] be inadvertently suppressed." *Central Hudson,* 447 U.S. at 564–65, 100 S.Ct. at 2350–51; *id.* at 579–83, 100 S.Ct. at 2358–60 (Stevens, J., concurring). Here is our difficulty, for the SEC contends that providing publishers free text, whether directly through the provision of finished articles or indirectly by paying writers' fees to public relations firms, constitutes "consideration" within the meaning of section 17(b). The SEC argues that Stock Market Magazine publishes the company articles

"substantially" as penned by the featured companies or their publicists and that this practice should be disclosed. Conditioning regulation on the extent to which text is used, however, would result in both SEC and court interference with the "crucial process" of editorial control, interference that the Supreme Court has decried as particularly repugnant to core First Amendment concerns. *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 257–58, 94 S.Ct. 2831, 2839–40, 41 L.Ed.2d 730 (1974).

If, as the SEC argues, the consideration it wishes disclosed is the *substantial* use of free text, who will determine the line between substantial and insubstantial? Using what standards? If, for example, the editor of the magazine were to add several paragraphs to the article and edit the rest, would that have to be disclosed? Suppose instead of an article, the magazine is furnished a rather long press release, must that be disclosed if the press release is published with no change? With some change? If so, how is that distinguished from much financial or political news coverage in other newspapers and magazines with wider circulation, surely assumed to be fully protected by the First Amendment? If the SEC's requested injunction were to issue, these vexing questions could only be answered in a contempt proceeding, and the threat of that would surely chill protected speech. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973).[10] Nor do we

9. Requiring disclosure of a material fact in order to prevent investor misunderstanding is the very essence of federal securities regulation. "The appropriate test for the materiality of an omitted fact is whether there is a substantial likelihood that a reasonable investor would consider the fact important in making his or her investment decision." *Zweig v. Hearst Corp.,* 594 F.2d 1261, 1266 (9th Cir.1979) (citing *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *see Basic Inc. v. Levison,* —— U.S. ——, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (explicitly adopting this standard of materiality for Rule 10b–5 violations). To be sure, *Lowe* suggests "[t]he dangers of fraud, deception, or overreaching" may be lessened in publications, like Stock Market Magazine, "that are advertised and sold in an open market," 472 U.S. at 210, 105 S.Ct. at 2573, but

the Court has never required a determination that speech be actually fraudulent in order to permit government regulation, but only that there be a "significant possibility" that the speech be misleading. *Friedman v. Rogers,* 440 U.S. 1, 13, 99 S.Ct. 887, 896, 59 L.Ed.2d 100 (1979); *see also Central Hudson,* 447 U.S. at 563, 100 S.Ct. 2350.

10. On the other hand, if the SEC's interpretation of "consideration" were thought to reach *all* free text supplied to the magazine no matter how marginal its use, we would see less interference with the editorial process, but, in that event, government regulation would directly interfere with the news gathering operations of the magazine. Requiring disclosure of sources of information used in a publication, it should be readily understood, strikes at the very heart of a free

think that a subject company's payment of fees to a public relations firm (or a freelance writer) to produce the text supplied to the magazine stands on any different footing than the free text itself. The public relations firm, in that event, simply replaces an employee of the company who would otherwise write the material. Disclosure of that arrangement would still depend, according to the SEC, on how much of the text produced is actually used by the magazine.

■ The fundamental difficulty with the SEC's interpretation of "consideration" in 17(b) as applied to this case, involving a magazine in many respects similar to one of general circulation, is that one of the objects of its requested injunction, the receipt of free text, inevitably implicates interference with fully protected journalistic activity. In other words, so long as consideration is defined in accordance with the material used in the publication, the very definition of consideration will necessarily constitute the line between the sphere of permitted regulation—disclosure of the omitted fact—and wholly protected speech. The crucial factor that distinguishes the feature articles from the balance of the magazine—and which constitutionally justifies regulation—is not the glowing terms used to describe the companies featured. If that were so, the SEC and the federal judiciary would be propelled into what is very close to content regulation of speech. *Cf. Boos v. Barry,* — U.S. —, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988).[11] Rather, permissibility of the disclosure requirement must necessarily turn solely on whether consideration was paid to the magazine for publication of the article—and not on the content of the publication.[12] Were the government to show, for example, direct cash payments to Brown, the Managing Editor, such transactions might well be distinguishable from writers' fees because the payments might be tantamount to payments to the publisher to *carry* the article. Requiring disclosure of such payments would not interfere with either editorial judgments concerning the content of the feature articles or news gathering practices.[13] If consideration were shown to be paid directly in exchange for publication of the articles, therefore, even if the articles were somewhat more subtle in their favorable portrayal of the subject companies' securities than is the typical Stock Market Magazine feature article, we think the disclosure requirement would apply. But, if in order to determine whether consideration was paid, and thus must be disclosed, the court first had to examine the free text and determine how substantially the text contributed to the final published product, both it and the SEC would inevitably and impermissibly be drawn into the arena encompassing content regulation.

To be sure, the government seeks, by disclosure, to add, not detract, from the information available to the public, but unlike designating the Canadian films as political propaganda pursuant to congressional direction as permitted by *Meese v. Keene,* — U.S. —, 107 S.Ct. 1862, 95

press. *Cf. Branzburg v. Hayes,* 408 U.S. 665, 681–82, 92 S.Ct. 2646, 2656–57, 33 L.Ed.2d 626 (1972). Furthermore, the less the text is used, the less the government interest is in disclosing its receipt.

11. Content-based regulations are objectionable because they put the government into the unneutral position of approving some while disapproving other speech, on the basis of the viewpoints expressed. If this problem is not precisely present here, it is certainly analogous.

12. Appellee does not argue that the feature articles, appearing as they do in a magazine aimed almost exclusively at small investors, do not bear on the stock price of the company featured. We need not, therefore, delineate the boundary between such articles and news articles in a magazine or newspaper of general circulation that also focus on a particular corporation. Even were such articles published in exchange for consideration, they very likely would not come within the ambit of 17(b)'s disclosure requirement.

13. Similarly, in *Zweig v. Hearst Corp.,* 594 F.2d 1261 (9th Cir.1979) and *SEC v. Blavin,* 760 F.2d 706 (6th Cir.1985), involving journalists engaged in scalping, the burden of regulation fell not directly on the content of the publications but rather on the stock transactions engaged in by the journalist around the time of publication.

L.Ed.2d 415 (1987),[14] forcing a magazine to label its contents as published in return for consideration received from the subject of its articles carries an inherently pejorative connotation. Indeed, such a label converts the article in the reader's mind into an advertisement and surely would sharply diminish the magazine's attractiveness and circulation. Although section 17(b)'s language is facially broad, all depends on how one defines consideration. The House Report described this section as "particularly designed to meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for." House Report at 24; *see supra* note 6. That term "bought and paid for" suggests, particularly in light of the constitutional difficulties we have described, a crisp transaction sharply distinguished from normal journalistic editing or news gathering practices. We think then that section 17(b) may not be interpreted as the SEC would wish nor may an injunction issue that reaches as widely as the SEC requests.

While section 17(b) thus cannot support a disclosure requirement premised on the receipt or use of free text, the language of the statute is sufficiently broad that we believe the district court erred in dismissing the complaint. There was some evidence in the record that consideration other than free text, including the purchase of advertising space and orders for reprints, was a *quid pro quo* (*i.e.*, a tie-in agreement) for publication of the articles that the SEC regards as deceptive. Deciding the case on motions for summary judgment, the district court never determined whether such arrangements existed. If they did exist, we have no doubt that an injunction could be fashioned to require disclosure when consideration is paid in this distinct form, without trammeling fully protected speech or interfering with editorial practices that cannot be separated therefrom.

As long as free text, however provided, is not included among the elements of consideration that must be disclosed under section 17(b), an injunction should be permissible if the SEC can establish the necessary factual predicate at trial. In light of the concerns we have outlined, such an injunction must set forth with particularity the types of consideration that must be disclosed so as to avoid improper encroachment into protected speech.

\* \* \* \* \* \*

We reverse the district court's decision granting summary judgment to the defendant, and remand the case for further proceedings consistent with this opinion to address the merits of the SEC's request for an injunction against WSPI.

*It is so ordered.*

---

**14.** The propriety of the Attorney General's determination that the films were within a regulated

category of speech was not at issue. 107 S.Ct. at 1864.