### SMITH et al. v. FISHBACK et al.

#### No. 5414.

Court of Civil Appeals of Texas. Texarkana.

Nov. 16, 1938.

Rehearing Denied Dec. 1, 1938.

J. A. Ward, of Mt. Pleasant, F. B. Caudle, of Mt. Vernon, Felts, Wheeler & Wheeler, of Austin, and Wm. R. Watkins, of Fort Worth, for appellants.

Bascom Perkins and Sam Williams, both of Mt. Pleasant, Frank Edwards, of Clarksville, Wm. Hodges, of Texarkana, and W. D. Suiter, of Winnsboro, for appellees.

HALL, Justice.

Appellants, other than David S. McCutcheon, and appellees were owners of land in Franklin and Titus Counties in and adjacent to the Talco Oil Field. At various dates during the spring and summer of 1936 appellees and appellants, other than McCutcheon, in severalty conveyed by royalty pool contracts, a part of their oil

and gas royalty to W. W. Smith as Trustee for the benefit of a private corporation to be organized in the future by and through the efforts of one David S. McCutcheon who was named in said royalty contracts as party of third part. David S. McCutcheon was to defray all expenses incident to securing the royalty deeds and forming the corporation for which he was to receive 25% of the capital stock of the proposed corporation, and the participating land-owners were to receive the remaining 75% of said stock in the proportion that the royalty acres conveyed by each of them to the Trustee bore to the whole.

Appellees instituted this suit in the District Court of Titus County against appellants to cancel and rescind their royalty pool contracts and for damages alleging as grounds therefor that: "The said David S. McCutcheon and his aforesaid associates and agents represented to each and all of plaintiffs, and promised, guaranteed and insured the plaintiffs, and each of them, that they, plaintiffs, would receive a check, or checks, for dividends within ninety (90) days from the day the first well came in as a producer on any part of the land included in the royalty pool. Said David S. McCutcheon and his aforesaid agents and associates further represented, promised, guaranteed and insured plaintiffs that if they, plaintiffs, and each of them did not receive said checks within the time last above mentioned that each of said plaintiff's royalty contracts would become void, and in such event plaintiffs would be clear of their obligation and their contracts would be returned to plaintiffs. Said David S. McCutcheon, his agents and associates further represented that the first check to be received by each of the plaintiffs would be for the sum of Three Hundred Fifty Dollars ($350.00), based on eighty (80) acres of royalty." That the said David S. McCutcheon and his agents represented "that he had devised a scheme whereby no person, who executed said royalty contract, or participated in the pool agreement, could loose anything and that said scheme was to be a pooling of royalties by plaintiffs among themselves, that by doing so each and all the plaintiffs would be guaranteed a large income for life from dividends derived from said pool, whether the lands of each of the plaintiffs produced oil or not." It was alleged further by appellees that David S. McCutcheon represented to them that certain persons on whose land production of oil had already been secured had joined the contemplated oil pool; that it was fraudulently represented to some of appellees by David S. McCutcheon that all members of the pool were "compelled and required to place in said 'royalty pool' at least one-half the royalty on any tract of land which was pooled" and that all participants in said pooling contract had so done. It was alleged further by appellees that David S. McCutcheon and his agents represented that the proposed pool had been approved by the United States Government, and that it was exactly like the pool provided by the United States Government for the Osage Indians. That this Osage Indian pool had made all the Indians of the Osage tribe rich and that if appellees would join in the proposed pool they would also become rich. Appellees alleged further that these statements were false and fraudulently made, that they were material and each of appellees, being ignorant of the true facts, relied on them and were induced thereby to execute the pooling contracts sought to be cancelled.

Appellees also alleged further "that the royalty pool contracts, executed by them and others, as heretofore stated, at the active solicitation and request of the said David S. McCutcheon and his agents and associates, were and are in reality subscriptions to stock in the proposed corporation to be formed as heretofore stated, and the subscriptions of stock had been subscribed by more than twenty-five different subscribers to the capital stock of a Texas corporation to be known as 'Talco Royalty Pool, Inc.'"; that said corporation has not been organized, that no charter has been filed by the Secretary of State, and on information and belief appellees alleged that no charter will be filed by the Secretary of State. It is alleged further by appellees that the action of David S. McCutcheon and W. W. Smith, Trustee, in actively soliciting and securing the royalty contracts and mineral deeds constitutes them dealers in securities "in that said parties were securing and did cause to be secured pre-organization subscriptions to the capital stock of the royalty pool corporation to be formed and to be later chartered for more than fifteen subscribers." As defined by the Securities Act of the State of Texas, Article 600a, Vernon's Ann.Civ.St., that neither W. W. Smith, Trustee, nor David S. McCutcheon had a permit from the Secretary of State of Texas as required by the Securities Act to engage in the business of organizing

said corporation in the manner alleged. That neither Smith, Trustee, David S. McCutcheon, Cecil McCutcheon, nor C. E. Townsend, agents of said David S. McCutcheon, had a permit from the Secretary of State of Texas as a dealer or salesman to sell securities in this state as required by the Securities Act. That the 25% of the stock in the proposed corporation to be assigned to David S. McCutcheon as compensation for his services in organizing and promoting said corporation was in excess of the amount allowed by law for such purpose; that said royalty pool contracts were without consideration in that the cash consideration recited in same was never paid, and that Smith, Trustee, and David S. McCutcheon and his agents had no authority under the law to perfect said corporation. It is alleged further by appellees that more than six months have elapsed since production was first had on land within the pool and no corporation has been organized, nor have any articles of corporation been presented to appellees for signature. That the failure of Smith, Trustee, David S. McCutcheon and his agents to comply with the provisions of the Security Act of this state renders these royalty pooling contracts void. Attached to appellees' petition were the royalty pool contracts sought to be cancelled and rescinded.

Appellants answered by general demurrer and numerous special exceptions, all of which were overruled by the court, general denial, and specially denied all the allegations in appellees' petition. Appellant David S. McCutcheon answered further alleging that he had expended more than $7000 in connection with the organization of the said pool; that in June 1936, after the discovery of oil on the land in the pool in May 1936, McCutcheon called a meeting of all persons owning interest in said pool, and in said meeting the owners selected an attorney to form a corporation, the expense therefor to be borne by McCutcheon. Thereafter, in July, at least a majority of landowners in said pool met and formed a de facto corporation, elected directors, adopted by-laws, and directed the Trustee to convey the trust property to the corporation. That the charter of the proposed corporation was presented to the Secretary of State who refused to file the same unless the following requirements were met: (1) Information showing that the capital stock was fully paid; (2) attorney's opinion showing that the grantors of the mineral interest to W. W. Smith, Trustee, had good title thereto; and (3) that said corporation apply for an issuer's permit and dealer's license under the Texas Security Act.

Trial was to a jury. At the conclusion of the testimony the court on his own motion discharged the jury and rendered judgment for appellees, cancelling said royalty pool contracts and removing cloud on their title cast by said contracts. No damages were allowed. The case is now properly before us for review.

■ No error is assigned by appellants to the action of the court in discharging the jury. No findings of fact or conclusions of law were filed by the trial court and none were requested; so, if the judgment of the court below can be affirmed on any theory, it is our duty to do so. Texas Creosoting Co. v. Hartburg Lbr. Co., Tex.Com.App., 12 S.W.2d 169; Adcock v. Shell, Tex.Civ.App., 273 S.W. 900, writ ref.; Boyd v. Keystone Driller Co., Tex. Civ.App., 6 S.W.2d 221, writ ref.; Johnson v. Campbell, Tex.Civ.App., 107 S.W.2d 1111.

Two controlling questions are presented by this appeal; first, Were David S. McCutcheon and his agents, Cecil McCutcheon and C. E. Townsend, guilty of fraud in the procurement of the royalty pool contracts? second, Was it incumbent upon David S. McCutcheon, W. W. Smith, Trustee, Cecil McCutcheon, and C. E. Townsend before beginning the organization of the proposed royalty pool corporation and the exchange of stock therein to the several landowners for interest in their royalty to secure from the Secretary of State an issuer's permit or dealer's license under the Securities Act of this State? It is admitted in this record that neither David S. McCutcheon, Smith, Trustee, Cecil McCutcheon, nor C. E. Townsend had any permit or license of any kind from the Secretary of State before they began the organization of the proposed royalty pool corporation.

We shall discuss first the issue with respect to the failure of David S. McCutcheon, W. W. Smith, Cecil McCutcheon, and C. E. Townsend, or either of them, to secure a permit or license under the Texas Securities Act prior to the formation of the proposed royalty pool corporation and the sale or exchange of its stock for the oil royalty of appellees. The royalty pool contracts executed to W. W. Smith, Trus-

tee, by the several landowners were the same with the exception of the names of the grantors, date, description of the property, number of acres, and the fractional interest of the royalty conveyed; and each provided, (1) that the landowner should be the first party, W. W. Smith, Trustee and Grantee, the second party, and David S. McCutcheon the third party; (2) the description of the land; (3) the assignment to the Trustee by the landowner of the fractional part of his royalty to be by said Trustee later assigned to a corporation to be formed; (4) that second parties shall forthwith after discovery of oil or gas on the land in the royalty pool "and in any event within 90 days thereafter," draft articles of incorporation and present them to the Secretary of State for the organization of a Texas corporation, and failure of the second parties to take the necessary steps to form said corporation "within the period of 60 days following the production and discovery of oil within the pool area in commercial quantities" the landowners or other parties are given the authority to organize said corporation in accordance with the terms of the royalty pool contracts; (5) "The Corporation to be formed shall be capitalized on the basis of the authorization of one class only of no par value stock having equal voting and participating rights. The amount of the capital stock to be authorized to be determined as follows:

"There shall be issued to the first parties, and to each of the other owners that have entered into similar agreements, as aforesaid, one share of said capital common no par value stock for each share of land represented by this agreement and similar agreements as aforesaid, provided the royalty interest assigned by such agreement is one-sixteenth part of all the oil and, or gas produced from the lands covered thereby; if the royalty interest assigned by such agreement is a thirty-second part of all oil and, or gas produced from the lands covered thereby, then there shall be issued a one-half share of stock for each acre, and so on in the same ratio as the royalty interest varies from a one-sixteenth. The total of the authorized capital stock issued on the acreage basis above defined to the assignors in this and similar agreements covering lands described in Schedule 'A' hereto shall constitute 75 per cent of the total authorized capital stock of the Corporation. The remaining 25 per cent of the authorized capital stock of such corporation shall forthwith after the incorporation be issued to David S. McCutcheon, of Detroit, State of Michigan; in consideration of his services heretofore performed and hereafter to be performed in connection with the organization of the plan hereby contemplated and procuring of this and similar assignments for the mutual benefit of the first party herein and the Assignors named in this and such similar assignments, and first parties specifically agreed to the issuance of said 25 per cent of the total capital stock of the said corporation to the third parties or their assigns."

(6) The powers and functions of said corporation to be formed are limited to the collection and distribution of profits realized from the royalties owned by it; (7) David S. McCutcheon of Detroit, Michigan, shall be solely liable for "all costs and expenses incurred or paid in connection with the promotion and organization of the plan hereby contemplated * * *" including all the expenses, fees and disbursements incident and incurred with the incorporation and organization of the corporation hereby proposed to be formed * * *"; (8) "The said first parties (landowners) and David S. McCutcheon, (third party) of Detroit, State of Michigan, *do hereby expressly subscribe for and agree to receive and accept capital stock in said corporation to be formed on the basis of authorization and issuance of the capital stock of such corporation hereinbefore particularly set forth;"* (9) "It is further agreed that such corporation to be formed *shall be organized in accordance with and shall be governed by the laws of the State of Texas with reference to such corporations."* (All italics ours.)

It is clear to us from the very terms of the royalty pool contracts summarized next above that David S. McCutcheon was the moving force in organizing the proposed corporation. He was solely liable for all expenses incurred in its promotion and organization for which he was to receive 25% of its total capital stock. Moreover, the undisputed evidence in this record indicates that David S. McCutcheon was selling stock in the proposed royalty corporation. The record discloses further without dispute that Cecil McCutcheon and C. E. Townsend were his agents in the promotion, organization and sale of stock in the proposed organization. That these two agents, singly or together with one Amos Wilson,

approached each and every landowner who comprise this royalty pool, some as many as three times, for the purpose of persuading them to convey a fractional part of their ⅛ royalty to the Trustee, Smith, in exchange for stock in the proposed royalty corporation. In one instance, at least, that of Mrs. Mary Groves of Oklahoma, David S. McCutcheon himself assisted in securing her and her husband's signatures to a royalty pool contract. Some of appellees testified without dispute that this arrangement of forming the royalty pool corporation was first proposed to them by the agents of David S. McCutcheon, and we think it clearly deducible from all the evidence that this scheme was formed and carried into execution by David S. McCutcheon and his agents. The evidence shows that no one of the landowners made any request for him to assist them in forming a royalty pool. There is no intimation in the record that the landowners forming this royalty pool came together in the first instance and sought out McCutcheon to aid them in forming a corporation. So far as this record discloses, David S. McCutcheon initiated the movement that culminated in the promotion of this royalty pool corporation.

In 1935 the 44th Legislature at its Regular Session passed H.B. # 521, c. 100, known as the Securities Act. This Act is Article 600a, R.C.S. Vernon's Ann.Civ.St. art. 600a, and repeals the blue sky laws, Articles 579–600, inclusive. It is comprehensive in its terms and provisions and is very lengthy, covering some twenty-six pages, and will not in its entirety be copied in this opinion, but only such portions thereof as we think applicable and pertinent to this case.

Section 1 provides that the Act shall be known as the "Securities Act." Section 2, Subdivision (a), provides that "the term 'security' or 'securities' shall include any share, stock, * * * preorganization certificate or receipt, * .* * certificate in or under a profit sharing or participation agreement, certificate or any instrument representing any interest in or under an oil, gas or mining lease * * * or any other instrument commonly known as a security, whether similar to those herein referred to or not."

Subdivision (b): "The term 'company' shall include a corporation, a person, joint stock company, partnership, association, company, syndicate trust, incorporated or unincorporated, heretofore or hereafter formed under the laws of this or any other State, country, sovereignty or political subdivision thereof. * * *"

Subdivision (c): "The term 'dealer' shall include every person or company, other than a salesman, who engages in this State, either for all or part of his or its time, directly or through an agent, in selling, offering for sale or delivery or soliciting subscriptions to, or orders for, or undertaking to dispose of, or to invite offers for, or dealing in any other manner in any security or securities within this State. Any issuer other than a registered dealer, of a security or securities who, directly or through any person or company, other than a registered dealer, offers for sale, sells or makes sales of its own security or securities shall be deemed a dealer and shall be required to comply with the provisions hereof; * * *."

Subdivision (d): "The term 'salesman' shall include every person or company employed or appointed or authorized by a dealer to sell, offer for sale or delivery, or solicits subscriptions to or orders for, or deal in any other manner, in securities within this State, whether by direct act or through subagents; * * *."

Subdivision (e): "The term 'sale,' or 'offer for sale' or 'sell' shall include every disposition, or attempt to dispose of a security for value. The term 'sale' means and includes contracts and agreements whereby securities are sold, traded or exchanged for money, property or other thing of value, or any transfer or agreement to transfer, in trust or otherwise. * * * The term 'sell' means any act by which a sale is made, and the term 'sale' or 'offer for sale' shall include a subscription, an option for sale, a solicitation of sale, an attempt to sell, or an offer to sell, directly or by an agent or salesman, * * * nothing herein shall limit or diminish the full meaning of the terms 'sale,' 'sell' or 'offer for sale' as used by or accepted in courts of law or equity. * * *"

Subdivision (g): " 'Issuer' shall mean and include every company or person who proposes to issue, has issued, or shall hereafter issue any security."

Subdivision (j): "If the sense requires it, words in the present tense include the future tense, in the masculine gender include the feminine and neuter gender, in the singular number include the plural number, and in the plural number include

the singular number; 'and' may be read 'or' and 'or' may be read 'and.'"

Subdivision (l): "The term 'include' when used in a definition contained in this Act shall not be deemed to exclude other things or persons otherwise within the meaning of the term defined."

Section 3 of the Act enumerates certain transactions to which its provisions shall not be applicable.

Subdivision (j): "The sale by any domestic corporation of its stock or other securities issued in good faith and not for the purpose of avoiding the provisions of this Act, so long as the total number of stockholders and security holders of said corporation does not and will not after such sale exceed twenty-five (25) and the securities are issued and disposed of without the use of advertisements, circulars, agents, salesmen, solicitors, or any form of public solicitation."

Subdivision (k): "The sale of an interest in any partnership, pool, or other company, not a corporation, the total membership of which does not and will not after such sale exceed ten (10), and the organization expenses of which do not or will not exceed two (2) per cent of the total invested capital of such company."

Subdivision (l): "Subscriptions to capital stock necessary to qualify for incorporation when subscribed by not more than fifteen (15) incorporators in a proposed Texas corporation."

Subdivision (q) excludes from the provisions of this Act certain farmers' co-operative associations organized under R.S. Articles 5737–5764, inclusive; and R.S. Articles 2514–2524, inclusive. "Provided, however, this exemption shall not be applicable to agents and salesmen of any farmers' cooperative association or farmers' cooperative society when the sale of such securities is made to non-members, or when the sale of such securities is made either to members or non-members and a commission is paid or contracted to be paid to said agent or salesman."

Section 4 of the Securities Act provides: "It shall not be necessary to negative any of the aforesaid exemptions in any complaint, information or indictment, or any writ or proceeding laid or brought under this Act; and the burden of proof of any such exemption shall be upon the party claiming the same."

Section 7 of said Act provides:

"In the event any dealer as defined herein shall sell or offer for sale any preorganization certificate or receipts, or shall in any manner solicit subscriptions to or in any proposed corporation, trust or joint stock company proposed to be formed, the Secretary of State may require, if he deems it necessary to protect the interests of prospective subscribers or certificate holders, the dealer so offering such securities for sale to deposit all moneys and funds received from the sale thereof, except such amounts thereof as the Secretary of State may have under this Act allowed as preorganization expenses and commissions for the sale of such security, to be deposited in a trust account in some bank or trust company doing business in the State of Texas, until such time as such proposed company shall have sold the minimum amount of capital to authorize it to begin business in Texas. * * *

"The total expenses, including organization expenses and all commissions paid to salesmen of any proposed company, as herein defined, shall not exceed twenty (20) per cent of the total amount of capital sought to be employed in such proposed company."

Section 12 of the Act provides: "Except as provided in Section 3 of this Act, no person, firm, corporation or dealer shall, directly or through agents or salesmen, offer for sale, sell or make a sale of, any securities in this State without first being registered as in this Act provided." The remaining provisions of this Section apply to any unregistered dealer.

Section 13 of this Act provides the method by which a dealer may register with the Secretary of State.

Section 30, Vernon's Ann.P.C. art. 1083a, provides that the punishment for failure to comply with its terms shall be a fine of not more than $1000 or imprisonment for not more than two years, or both such fine and imprisonment.

Do the acts and conduct of David S. McCutcheon, W. W. Smith, Trustee, Cecil McCutcheon, and C. E. Townsend in promoting and organizing this royalty pool corporation and in exchanging its stock for appellees' oil royalty come within the terms of the Texas Securities Act requiring them to secure from the Secretary of State a permit before engaging in said transactions? There is no doubt in our

minds but that the terms "security" and "securities" as defined in the Act are broad enough to comprehend the stock in the proposed corporation for which the royalty pool contracts executed by the landowners to Smith, Trustee, were given. These pool contracts were in themselves "pre-organization certificates" or "receipts" for the reason that they were executed by the landowners in full payment for stock in the proposed corporation and represented the only evidence of stock and the amount thereof purchased by them. Looking to the royalty pool contracts alone, we find they expressly provide for the promotion of a private corporation by David S. McCutcheon, 75% of its stock to be issued to appellees and the other royalty owners on the basis of the total number of royalty acres covered by said pool contracts as shown by the portions of said contracts heretofore set out. We think, therefore, the conclusion is inescapable that each of these pool contracts represents a sale by McCutcheon and his agents of stock to, and a purchase by the landowners, in the proposed corporation. On the dates of execution of the several royalty pool contracts, the proposed corporation was under the absolute control of David S. McCutcheon. He was its promoter and organizer. He and his agents alone had its nebulous stock for sale or exchange, and he and his agents were doing just this thing when they exchanged 75% of its stock for the oil and gas royalty under the various tracts of land belonging to appellees. In this connection it is pertinent to point out that the term "sale" as defined in the Securities Act "means and includes contracts and agreements whereby 'securities' are sold, *traded or exchanged for money, property or other thing of value, or any transfer or agreement to transfer in trust or otherwise.*" (Italics ours.) The oil and gas royalty conveyed by the several landowners to Smith, Trustee, comprised the sole assets of the said proposed corporation and its total capital stock was based thereon. The landowners together with McCutcheon were to own all the stock in said proposed corporation. The record also shows that the number of landowners executing deeds of royalty to this pool were in excess of twenty-five; so, then, the promotion and organization scheme does not come under either exception J, K, or L of Section 3, because the number of shareholders in the proposed

corporation were in excess of the number prescribed in each of said exceptions; and the organization expenses were in excess of that allowed by either of said exceptions. In Brownie Oil Co. of Wisconsin v. Railroad Commission of Wisconsin, 207 Wis. 88, 240 N.W. 827, 87 A.L.R. 33, the Supreme Court of Wisconsin in construing a statute of that State very similar to the Securities Act of this State defining "security" and "securities" held that a contract entered into by an oil company by issuing books of coupons to be used in part payment for purchases made at its gas stations and by entering into good-will contracts with the purchasers of these coupon books agreeing in consideration of such purchase, to set aside a certain sum of money for each gallon of gas so purchased as a trust fund to be used in acquiring other stations the proceeds of the sale of which were to be distributed among the holders of said contracts, is a "security" and the sellers thereof were required to obtain a permit under the Wisconsin Act. We conclude, then, that the exchange by David S. McCutcheon, Cecil McCutcheon and C. E. Townsend, his agents, of stock in the proposed royalty corporation for appellees' oil royalty as evidenced by the royalty pool contracts executed by them to Smith, Trustee, comes squarely within the prohibition contained in the Securities Act set out above. The position of Smith, Trustee, we think, was that of stake-holder, acting for the convenience of David S. McCutcheon and his agents in carrying out the scheme of organizing the proposed corporation.

We shall next discuss appellants' proposition No. 6, which is: "If the Securities Act of 1935 is held to be applicable to the transactions involved in this case, in which plaintiffs and defendants combined royalty interests in a limited area in the hands of a trustee, agreeing to form a private corporation, the sole function of which would be to collect and disburse to plaintiffs and defendants, according to their respective interests, the proceeds of such royalty, then, said act is violative of the due process clause of the Constitution of Texas [article 1, § 19], and of the Fourteenth Amendment to the Constitution of the United States [U.S.C.A.], because, (a), it constitutes an arbitrary and unwarranted invasion of the private right to contract and, (b), is so indefinite and uncertain

that neither plaintiffs nor defendants had any cause to believe said transactions were within the terms of the Act."

No appellate court in Texas had passed upon the constitutionality of any part of the Securities Act until the decision of the recent case of Roger J. Atwood v. State of Texas, 121 S.W.2d 353, not yet reported [in State report], by the Court of Criminal Appeals, opinion handed down October 19, 1938. We have been furnished with a copy of that opinion by the Secretary of State. It appears in that case that Atwood, the defendant, was engaged in selling oil and gas leases without first applying for and receiving a permit from the Secretary of State. He was tried under the criminal provision of the Act and fined $500. In affirming the judgment of the lower court, the Court of Criminal Appeals passed upon such sections of the law only as had application to that case, and held them constitutional. In its opinion that court in part said [page 355]:

"The law [Securities Act] is a regulation of business. It is designed to protect the public against the frauds of those engaged in selling securities which represent nothing substantial. * * *

"Granting that appellant was the owner of the oil and gas lease upon which the indictment is predicated, it is observed that his course of dealing with oil and gas leases generally constituted him a dealer within the purview of the statute. It follows that, if effect is to be given to the announcement of the judicial precedents, we must hold that the Legislature transcended no constitutional limitation in requiring owners of securities to register when the things they do place them in the category of dealers."

The case of Hall v. Geiger-Jones Co., 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480, L.R.A.1917F, 514, Ann.Cas.1917C, 643, is by the United States Supreme Court, decided in 1917, and seems to be the leading case on the question here involved. In that case the Securities Act of Ohio was before that Court for construction. In holding the Ohio Act constitutional the Court in part said [page 220]:

"It will be observed, therefore, that the law is a regulation of business, constrains conduct only to that end, the purpose being to protect the public against the imposition of unsubstantial schemes and the securities based upon them. Whatever pro-

hibition there is, is a means to the same purpose, made necessary, it may be supposed, by the persistence of evil and its insidious forms and the experience of the inadequacy of penalties, or other repressive measures. * * *

"Even if the descriptions be regarded as rhetorical, the existence of evil is indicated, and a belief of its detriment; and we shall not pause to do more than state that the prevention of deception is within the competency of government, and that the appreciation of the consequences of it is not open for our review." (Citing cases).

Courts of last resort in the following states have held Securities Acts of those states constitutional: Alabama, Arkansas, California, Georgia, Illinois, Kansas, Kentucky, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, Tennessee, and Wisconsin. For a complete treatise on this question, see 87 A.L.R. pp. 45–60.

The Securities Act of this State is a clear and comprehensive regulation of the business of selling and issuing stocks and other security. To our mind, it is a very complete statute, all terms are defined, and nothing is left to guesswork. The Legislature had in mind the prevention of stockselling schemes, the only purpose of which was to defraud an unsuspecting public. There can be no doubt that the Legislature of this State had ample reason for passing a drastic and far-reaching Securities Act, for, we believe it can be safely said that no state in the Union has offered a richer field for stock promoters and the sale of worthless stock and securities than has Texas. The operation of this statute may be burdensome, to some extent, on the honest securities dealer, but he must suffer this inconvenience in order that the body of the people may be protected from the person who would engage in this state in a ruthless, unrestrained sale of worthless securities. It could make no material difference, so far as the applicability of the statute is concerned, that the stock in the proposed corporation was a safe investment. Commercial Bldg. Co. v. Levy, 108 Cal.App. 54, 290 P. 1048. The Act makes it the duty of all persons dealing in securities, good or bad, to first secure from the Secretary of State a permit before entering upon the business

of "selling" or "Exchanging" same for anything of value "for all or part of his time" either "directly or through agents" within this State. It is for the Secretary of State to determine, upon investigation, the matter of granting or refusing a permit; and in case of his failure to issue a permit upon proper application, the Act provides that the aggrieved party shall have a right to appeal to the courts of this State for redress. · The Legislature, in our opinion, had the authority under the police power of this State to enact the Securities Act. Therefore appellants' proposition No. 6 is overruled.

Appellants' proposition No. 7 is: "The Securities Act of 1935 does not invalidate the contracts involved in this case, even though the parties thereto should have had an issuer's permit or dealer's license."

As said before, no corporation has been formed, and this record discloses that no effort has been made by McCutcheon, whose duty it was to form the corporation, since the refusal of the Secretary of State to file the articles of incorporation in the first instance. And, so far as this record shows, no effort has been made by him, Smith, Trustee, Cecil McCutcheon, or C. E. Townsend, to comply with the provisions of the Securities Act. This Act prescribes no penalty against appellees as purchasers of securities. The law was enacted for their protection. The only act in furtherance of McCutcheon's scheme, if it can be considered such, was the execution by each of appellees of a royalty pool contract in exchange for stock in the proposed corporation, and this, after much persuasion on the part of McCutcheon's sales agents. The very royalty contracts executed by them provided that the proposed corporation should be organized according to law and this record is wholly devoid of any act or statement on the part of appellees indicating that they had actual knowledge of the failure of McCutcheon and his sales agents to comply with the provisions of the Securities Act before entering upon the scheme of forming the royalty pool corporation: Kneeland v. Emerton, 280 Mass. 371, 183 N.E. 155, 87 A.L.R. 1. There is nothing to show that appellees acted in collusion with McCutcheon or his sales agents in their failure to comply with the terms of this Act. Such being the case, there would be no justification in holding them to be in pari delicto with David S. McCutcheon and his sales agents

in its violation. In the case of Kneeland v. Emerton, supra, the plaintiff brought suit against defendant for the sum of $1500 paid by him for certain shares of stock of "a corporation at a time when neither the defendant nor the directors or authorized officers of the corporation had filed with the Commission of the Department of Public Utilities notice of intention to sell shares of capital stock of the corporation" in violation of the Massachusetts Securities Act. In affirming the judgment of the trial court in plaintiff's favor the Supreme Court of Massachusetts said [page 159]: "The conclusion seems irresistible that the purpose of the Legislature, as disclosed by the statutory words, and its chief design were that contracts made in violation of the statute should be void. In no other way can the individuals for whose protection the statute was enacted secure genuine relief from the evils liable to be inflicted upon them by unrestrained and unregulated sales of fraudulent securities. The statute here in question falls within the large class whereby it has been enacted that contracts are prohibited chiefly for the benefit of the person paying money or other consideration and the receiver is the principal offender. In such instances the latter may be compelled to refund. In construing statutes of that nature, it is established doctrine that a contract prohibited by the statute under penalty made for the benefit of the person parting with his valuable property will be void at his instance in, like manner as if in terms declared to be a nullity. The plaintiff as purchaser in ignorance of the fact that as to the shares of stock sold him by the defendant there had been failure to comply with the statute was not in pari delicto with the defendant. The prohibitions of the statute did not apply to him at all but only to the seller. The aim of the statute was to protect the class to which the plaintiff belongs against that to which the defendant belongs. Therefore, the sale being void, the plaintiff is entitled to recover the price paid upon rescission of the transaction. The plaintiff is only seeking 'to recover his own money and to prevent the defendant from unjustly retaining the benefit of his own illegal act,' an act which had its inception and fruition in violation of a highly penal statute." Attention is here directed to the numerous cases cited by that court in support of its holding. To the same effect is the case of Reilly

v. Clyne, 27 Ariz. 432, 234 P. 35, 40 A.L.R. 1005.

While we do not hold that the royalty pool contracts were, as a matter of law, void ab initio, it is our opinion under the facts in this case that they are voidable and subject to be set aside and cancelled at the suit of appellees, the royalty owners. It is undisputed in this record that no consideration was given for appellees' oil royalty, save and except the promised stock in the proposed corporation, which has not been delivered and can not be delivered under McCutcheon's set-up. Appellees' property is now in animated suspension, out of their reach, unless a court of justice will lend them aid. This proposition is therefore respectfully overruled.

Appellants' eighth proposition is: "Plaintiffs' petition fails to state a cause of action against defendants for cancellation of the contract sued upon, and the demurrers interposed thereto by defendants should have been sustained by the trial court."

What we have said in the foregoing opinion disposes of this proposition, and it is overruled.

The conclusions reached herein render unnecessary a discussion of the other assignments of error brought forward in this appeal.

The judgment of the trial court is affirmed.