Fabricant, Judith, J.
INTRODUCTION
This action arises from activities of the Office of the Secretary of the Commonwealth in enforcing Massachusetts securities laws with respect to certain communications regarding hedge funds, particularly a website operated by the group of plaintiffs who will be referred to herein collectively as “Bulldog Investors,” or “Bulldog,” and associated e-mail communication. The plaintiffs contend that the Secretary’s enforcement activities have violated their rights under the First Amendment to the United States Constitution and under the Commerce Clause. They seek injunctive relief and damages. Presently before the Court is the plaintiffs’ motion for a preliminary injunction. For the reasons that will be explained, the motion will be denied.
BACKGROUND[2]
Plaintiff Bulldog Investors General Partnership is a general partnership. Three of its general partners are private investment partnerships known as hedge funds: the plaintiffs Opportunity Partners, L.P., Full Value Partners, L.P., and Opportunity Income Fund, L.P. The fourth general partner, and managing partner, is the plaintiff Kimball & Winthrop, Inc., which is the sole general partner of Opportunity Partners Fund. Plaintiffs Full Value Advisors, LLC, and Spar Advisors, LLC, are the sole general partner and investment advisor to Full Value Fund and Income Plus Fund, respectively. Plaintiffs Phillip Goldstein, Steven Sam-uels, Andrew Dakos, and Rajeev Das are principals of one or more of the above-described entities. These entities and individuals will be referred to herein collectively as Bulldog Investors, or Bulldog. Bulldog Investors has not registered any offering of securities with the Securities and Exchange Commission (“SEC”). In 1992 and 2001, respectively, Opportunity Partners and Full Value Fund filed “Form D” with the SEC, claiming exemption from registration requirements.[3] Plaintiff Leonard Bioness, a resident of Massachusetts, is not affiliated with Bulldog Investors, as far as the materials before the Court disclose; he alleges that he “desires to have access to and to read the information contained in the Bulldog Investors website but is not interested in investing in any secu-riiy mentioned or described in that website.”
From about June 9, 2005, to January 5, 2007, Bulldog Investors maintained an interactive website that provided information about investment products offered by Bulldog Investors. The website made certain information available to any visitor, including press articles and a printable brochure describing Bulldog’s three investment vehicles, Opportunity Partners, Full Value Partners, and Income Plus Fund. The description gave a brief summary of each fund’s approach. It described Opportunity Partners as “a highly diversified fund primarily invested in publicly-traded closed-end mutual funds and operating companies that are selling substantially below their intrinsic values . . . [that] applies the firm’s proprietary investment methodology to ‘unlock’ these values.” Full Value Partners was described as “a fund that concentrates on taking substantial positions in undervalued operating companies and closed-end mutual funds,” and that “acts as a catalyst to ‘unlock’ these values through proprietary means.” Income Plus Funds, according to the brochure, “is a low-risk fund that primarily invests in undervalued income producing closed-end funds, real estate investment trusts, and other investments . . . attempts to produce better current returns with less risk than is achievable in the bond markets . . . [and] anticipates compounding of capital in addition to generating high current income.” Each fund, the brochure stated, “will hedge when deemed appropriate.” A link on the site available to any visitor provided the statement that “Bulldog Investors has delivered a net average annual return significantly higher than that of the S&P 500 Index. Moreover Bulldog has performed especially well in difficult investment periods like 2000 through 2002.”
The website provided additional information to a visitor who would click “I Agree” to the following disclaimer:
The information is available for information purposes only and does not constitute solicitation as to any investment service or product and is not an invitation to subscribe for shares or units in any fund herein. For the avoidance of doubt this website may not be used for the purpose of an offer or solicitation in any jurisdiction or in any circumstances in which such offer or solicitation is unlawful or not authorized. Whilst every effort has been made to ensure the accuracy of the information herein, Bulldog Investors accepts no responsibility for the accuracy of information, nor the reasonableness of conclusions based upon such information, which has been obtained from third parties. The Rates referring specifically to investment products offered by Bulldog Investors are only available for view with a username and password, which can be obtained by contacting the company on the Registration Form provided. The value of investments and the income from them can fall as well as rise. Past performance is not a guarantee of future performance and investors may not get back the full *415 amount invested. Changes in the Rates of exchange may affect the value of investments.
A website visitor seeking more specific information about the funds and their performance could request such information by clicking on a button labeled “send feedback,” which would lead to a registration screen seeking personal identifying information. To register a visitor would be required to indicate agreement to the disclaimer. At least one Massachusetts resident, one Brendan Hickey, did so on or about November 10, 2006. Steven Samuels responded to Hickey, by e-mail, attaching additional materials including information about the funds’ investment strategy and philosophy, the backgrounds of their managers, performance and recent successes, and news articles. Samuels’s e-mail stated, “While we are proud to have one of the best long term records in the business, it is very difficult to adequately describe what, why, and how we do what we do in a quick response to an e-mail inquiiy. Performance numbers for example show nothing of the risk taken to achieve those returns. I have attached some basic information on our management including performance and philosophy. I would be happy to spend a few minutes on the phone if you wish to discuss in more detail. Please contact me at” a telephone number provided.
Among the materials Samuels attached to his email to Hickey was one item that is the subject of considerable argument among the parties here: a copy of a letter, dated July 13, 2006, directed to investors in Bulldog’s funds. The letter discusses the funds’ returns as compared to the Standard & Poor 500 Index, current investments in particular companies, and a lawsuit against the SEC challenging a rule requiring registration of certain hedge fund managers. It then states:
We don’t need a nanny regulator to tell us right from wrong. And unlike most mutual fund managers, we put our money where our mouths are. Since day one a significant portion of our net worth has been invested in Full Value Partners so you can be sure that our interests are closely aligned with yours. In our opinion that is more important than all the cosmetic rules and regulations any regulator can dream up.
On January 31, 2007, the enforcement section of the Massachusetts Securities Division filed an administrative complaint with the Acting Director of the Securities Division against Bulldog Investors, alleging that Bulldog had offered securities for sale in the Commonwealth that were not properly registered or exempt, in violation of G.L.c. 110A, the Massachusetts Uniform Securities Act, and regulations thereunder, 950 C.M.R. §10 et seq., by means of the communications appearing in the website. The enforcement section sought a cease and desist order, an administrative fine, and other relief. Bulldog Investors answered the administrative complaint on February 21, 2007, denying the allegations and raising as a defense the allegation that the complaint abridged its rights under the First Amendment to the United States Constitution and Article XVI of the Massachusetts Declaration of Rights.
On March 23, 2007, while the administrative proceeding was pending, the plaintiffs filed this action. The complaint in this Court names Secretary of the Commonwealth William Galvin and Chief of Enforcement Patrick Abeam.[4] The complaint alleges that the conduct that forms the basis of the administrative complaint is “protected by the free speech and free press guarantees in the First Amendment to the Constitution of the United States and Article XVI of the Massachusetts Declaration of Rights,” and that the administrative proceeding chills the exercise of those rights, in that “[b]ut for the threat of sanctions and the litigation burden imposed by the Secretary, the Bulldog Investors website would continue to operate as it did prior to the Secretary’s action.” The complaint asserts claims under the federal and state civil rights acts, 42 U.S.C. §1983, and G.L.c. 12, §111, and seeks declaratory and injunctive relief, including a preliminary injunction. [5]
Contemporaneously with the filing of the complaint, the plaintiffs moved for a preliminary injunction. The Court (Gants, J.) declined to hear the motion at that time, preferring to await the Secretary’s action on the pending administrative complaint. When the administrative complaint remained pending several months later, after proceedings on cross motions for summary disposition, the plaintiffs in this action renewed their request for preliminary injunctive relief, and the Court set a briefing schedule and scheduled a hearing for October 23, 2007. On October 17, 2006, the Acting Director of the Securities Division issued a final order, on behalf of the Secretary, concluding the administrative proceeding.
The Court held a hearing on October 23, 2007, as scheduled. In light of the Secretary’s issuance of the final order, the Court at that time granted all parties’ request for leave to file supplemental memoranda, which the Court received on November 30, 2007. The plaintiffs now direct their request for a preliminary injunction toward enforcement of the final order, as well as any further effort at enforcement by the Secretary’s enforcement section. Their supplemental memoranda add a Commerce Clause theory to the First Amendment claim originally raised. The Secretary’s final order adopted the hearing officer’s findings of fact, as set forth supra, as well as her rulings of law, in substance, as follows. The Massachusetts Securities Act, G.L.c. 110A, §301, makes it unlawful for any person to offer securities for sale in the Commonwealth unless the securities are registered, the transaction is exempt, or the security is “federally covered.” The Act defines an offer to sell to include “every attempt or offer to dispose of or solici *416 tation of an offer to buy a security or interest in a security for value.” G.L.c. 110A, §401(2). The Act further provides that it should be construed so as to coordinate its interpretation and administration consistently with federal securities law. G.L.c. 110A, §415. Under federal case law and SEC decisions, an offer extends beyond the common-law contract concept, to include information that “conditions the public interest in particular securities.” See SEC v. Cavanaugh, 155 F.3d 129, 135 (2d Cir. 1988), and Carl M. Loeb, Rhodes & Co., 38 S.E.C. 843, 850 (1959). Under that definition, the hearing officer ruled, “it is clear respondents have offered securities for sale in the Commonwealth,” by disseminating the information on the website, in combination with the e-mail communication directed to Mr. Hickey.
Citing SEC decisions, the hearing officer rejected the contention that the website material did not constitute an offer because a visitor to the site who sought specific information about funds would have to register, indicating agreement to the disclaimer. The hearing officer went on to rule that Bulldog had not proved that it was exempt from registration requirements. The only exemption invoked was that under 950 C.M.R. §14.02(b)(13)(m), which exempts offers communicated through the internet if not “directed toward any investor or group of investors in the Commonwealth,” and presumes that such an offer is not so directed if it “contains indications that the offer is not being made in jurisdictions where it is not registered or appropriately exempted.” That exemption did not apply, the hearing officer ruled, because of the e-mail, with attached material, was directed specifically at a Massachusetts resident. The hearing officer also ruled that Bulldog’s activities were not exempt under other specified regulatory provisions that condition exemption on compliance with a ban on general advertising. Based on those findings and rulings, the Securities Division ordered that Bulldog cease and desist from further violations, comply with the act, and pay an administrative fine of $25,000. The Securities Division stayed the imposition of sanctions pending this Court’s ruling on the motion for preliminary injunction.
Affidavits submitted by the plaintiffs provide certain additional background information.[6] Leonard Bioness asserts that he has “no intention ever to invest in any hedge fund,” but is interested in learning about hedge funds “as a part of the process of striving to be a well educated investor.” He is interested in Bulldog Investors in particular because “Bulldog’s managers employ investment strategies that are somewhat similar” to his, so that information about Bulldog assists him in carrying out those strategies. In his view, the statement that fund managers’ investment in the funds they manage “closely aligns” their interests with those of investors is “well accepted” and not misleading. Further, he asserts, he is fully competent to analyze the accuracy of the information presented, and has no need for regulatory protection from such statements.
DISCUSSION
Under the well-established test of Packaging Indus. Group v. Cheney, 380 Mass. 609, 617 (1980), a preliminary injunction is warranted only when the moving party establishes both a likelihood of success on the merits of the claim, and a substantial risk of irreparable harm in the absence of an injunction. If both those factors are established, the Court must balance them against the harm that an injunction will inflict on the opposing party. Id. Where, as here, the opposing party is a public official performing a regulatory function for the protection of the public, the Court must also carefully consider the impact an injunction would have on the public interest. See Tri-Nel Mgmt., Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001); T&D Video, Inc. v. City of Revere, 423 Mass. 577, 580 (1996).
The Court thus begins the analysis with the issue of likelihood of success on the merits of the claims pled in the complaint: that the Massachusetts securities act, on its face and as applied to Bulldog’s conduct in connection with its website and e-mail communication, violates the federal and state civil rights acts by infringing on free speech rights guaranteed under the federal and state constitutions.[7],[8] The parties have focused their attention on the federal claim, and the Court will do the same.[9]
At the outset, it bears noting that the plaintiffs have not identified any court decision, at any level, striking down on First Amendment grounds any statute, regulation, or application of either with respect to the conduct of issuers in offering or advertising securities.[10] To the contrary, the United States Supreme Court has, on a number of occasions, cited the securities area as an example of speech regulation that does not violate the First Amendment. See Dun & Bradstreet, Inc. v. Greenmoss Builders, 472 U.S. 749, 758 n.5 (1985); Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 456 (1978); Paris Adult Theater I v. Slaton, 413 U.S. 49, 64 (1973); see also National Association for Adv. of Psychoanalysis v. California. Bd. of Psych., 228 F.3d 1043, 1054 (9th Cir. 2000); Securities & Exchange Commission v. Wall Street Pub. Inst., Inc., 851 F.2d 365, 372-73 (D.C.Cir. 1988); Bangor & Aroostook R.R. Company v. Interstate Commerce Comm’n, 574 F.2d 1096, 1107 (1st Cir. 1978); European Connections & Tours, Inc. v. Gonzales, 480 F.Sup. 2d 1355, 1370 (N.D.Ga. 2007); see generally Michael Siebecker, Corporate Speech, Securities Regulation, and an Institutional Approach to the First Amendment, 48 William&MaryL.Rev. 613, 618, 641-45 (2006). These statements are dicta, to be sure; the high Court has not yet directly confronted the question presented here. That the Court has repeatedly stated its assumption to that effect, however, provides strong guidance to this Court in its task of predicting how appellate *417 courts will resolve the question. See Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir. 2006); Harbury v. Dench, 233 F.3d 596, 604 (D.D.C. 2000).
The First Amendment analysis must begin with a determination of the nature of the conduct affected by the regulation — that is, is the conduct speech, and if so, what kind, commercial or non-commercial? The plaintiffs contend that the communications in issue are non-commercial speech, because they do not propose any commercial transaction. They also point to the comment quoted supra in the letter, which they characterize as political speech. Defendants argue that the conduct in issue is not speech at all, but is merely incidental to a regulable transaction, that is, the sale of securities. See Lowe, 472 U.S. at 232 (“offer and acceptance are communications incidental to the regulable transaction called a contract”). The Court is not persuaded by either of these arguments. Review of the website materials and e-mail attachments leaves no doubt that they are neither acts of offer and acceptance, in a direct contract sense, nor merely information about hedge funds in general or Bulldog funds in particular. Rather, they are in the nature of advertising, calculated to generate interest in investment in Bulldog’s funds, directly analogous to the advertising in issue in Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, 425 U.S. 748, 762 (1976). That such communications constitute offering within the broad definition of the securities laws does not in itself make them action as opposed to expression for purposes of the First Amendment.
The nature of the expression involved here, however, is clearly commercial, in the sense that the expression is “related solely to the economic interests of the speaker and its audience.” Central Hudson Gas & Elec. v. Public Serv. Comm’n, 447 U. S. 557, 561 (1980). That is true of the comment in the letter as well as the other materials; the inclusion of political commentary in otherwise commercially oriented speech does not change its fundamental character. See Board of Trustees, State Univ. of N.Y. v. Fox, 492 U.S. 469, 474-75 (1989); Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 637 n.7 (1985); Bolger v. Drugs Products Corp., 463 U.S. 60, 68 (1983).
After a period of considerable uncertainty on the point, a series of United States Supreme Court decisions has established that the First Amendment “protects commercial speech from unwarranted governmental regulation.” See Central Hudson, 447 U.S. at 561, citing Virginia Pharm. Bd., 425 U.S. at 761-62. However, “(t]he constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression . . . The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation.” Central Hudson, 447 U.S. at 563 (internal citation omitted). The Court has established a four-part test to evaluate restrictions on commercial speech.
First, a reviewing court must consider whether the speech provides truthful information about lawful activity. “There can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity. The government may ban forms of communication more likely to deceive the public than to inform it, . . . or commercial speech related to illegal activity.” Id. at 563-64 (citations omitted). From there, the analysis proceeds as follows:
If the communication is neither misleading nor related to unlawful activity, the government’s power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State’s goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government’s purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.
Id. at 564. The Supreme Court reaffirmed this four-part test just a few years ago in Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 555 (2001).
Defendants argue both that the speech relates to unlawful activity, and that it is misleading. On the issue of unlawful activity, Defendants point out that sales of unregistered securities to unaccredited investors, not subject to any other exemption, would violate federal law, 15 U.S.C. §77e. In the absence of any evidence either way, they urge the Court to assume that Mr. Hickey is not an accredited investor, so that advertising to him was communication about a sale that would be unlawful. The Court is not persuaded on this point. The communications in issue certainly appear designed to elicit interest in investing among the public generally, but their content does not address investing by unaccredited investors. Operation of hedge funds, and investment in them, is not unlawful as a general matter.
Defendants argue that the statement in the letter to investors that “our interests are closely aligned with yours” is misleading.[11] They base that contention on Goldstein v. SEC, 451 F.3d 873, 887 (D.C.Cir. 2006). In that case, brought by one of the Bulldog plaintiffs in this case, the Court held that investors in a hedge fund are not clients of the fund’s advisor for purposes of a rule under which exemption from registration depends on the number of the advisor’s clients. If investors were clients, the Court reasoned, fund advi-sors would be subject to conflicting duties, because *418 investors’ interests would depart from those of the fund in circumstances of financial distress. Id., 451 F.3d at 873.
The Goldstein decision recognizes that the interests of fund advisers and investors can depart under certain circumstances. The letter does not say otherwise. The point it expresses is that Bulldog’s fund advisors are themselves investors in the fund, so that they share the interests of other investors in the fund’s performance. Fuller disclosure might lend context to that statement, and prevent any exaggerated interpretation of it, but nothing before the Court indicates that the statement itself is untrue.[12] The Court is not persuaded that the statement contained in the letter is misleading in the sense that would deprive it of First Amendment protection under Central Hudson.
Since the information communicated has not been shown to be either misleading or related to unlawful activity, the Court must turn to the second step of the Central Hudson analysis, which involves consideration of the interest the State seeks to serve by the regulation. That interest is to protect the integrity of capital markets, and thereby to preserve the overall health of the economy, by ensuring that investors make decisions based on full and accurate material information. The Great Depression brought home the importance of the interest, by demonstrating the catastrophic consequences of the absence of effective regulation in this area. In its wake, Congress enacted the Federal Securities Act of 1933, and states enacted various corresponding provisions. See S.E.C. v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186-87 (1963); S.E.C. v. Ralston Purina Co., 346 U.S. 119, 124-25 (1953); In the matter of Carl M. Loeb, Rhoades & Co., 38 S.E.C. at 848; Smith v. Fishback, 123 S.W.2d 771, 778 (Tex.Civ.App. 1938); In re Leach, 215 Cal. 536, 543 (1932); Stewart v. Brady, 300 Ill. 425, 430 (1921); Kneeland v. Emerton, 280 Mass. at 387-88; see also Merrick v. Halsey & Co., 242 U.S. 568, 586-88 (1917); Hall v. Geiger-Jones Company, 242 U.S. 539, 539-40 (1916). The Massachusetts Securities Act tracks the federal act, and seeks to serve the same purposes. Compare G.L.c. 110A, §301 with 15 U.S.C. §77e; compare G.L.c. 110A, §101 with 15 U.S.C. §78(b); see also G.L.c. 110A, §302. The decisions cited supra which refer to securities regulation as the quintessential example of justified speech regulation, unequivocally recognize the substantiality of the interests served. See Dun & Bradstreet, Inc., 472 U.S. at 758 n.5; Ohralik, 436 Mass. U.S. at 456; Paris Adult Theater I, 413 U.S. at 64; S.E.C. v. Wall Street Pub. Inst., Inc., 851 F.2d at 373; Bangor & Aroostook R.R. Co., 574 F.2d at 1107.
Since the regulation serves a substantial governmental interest, the Court must next consider the third and fourth prongs of the Central Hudson test, which, together, determine whether the regulation is “in proportion to that interest.” These prongs ask whether the regulation directly advances the state interest, and whether the interest “could be served as well by a more limited restriction on commercial speech . ..” 447 U.S. at 564. As to the third prong, the interest, again, is to protect the integrity of the capital markets, and the overall health of the economy, by ensuring that investors make decisions based on full and accurate disclosure of all material information. The regulations in issue serve that interest directly by prohibiting any public offering without registration, subject to narrow exemptions.[13] See G.L.c. 110A, §301. As applied here, the regulation prohibits expression that, although not in the form of an express offer, tends to promote interest in investment, and thereby to invite offers to purchase. Prohibition of such expression serves to limit solicitation of offers to those who have made full disclosure in connection with registration, and thereby directly serves the interests in issue.
The fourth prong of the Central Hudson test is the most difficult to apply here. Under that prong, the Court must determine whether the regulatory restrictions are narrowly tailored to serve the state interest; “if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so.” Thompson v. Western States Med. Ctr., 535 U.S. 357, 371 (2002); see Lorillard Tobacco Co., 533 U.S. at 566. The test is not, however, one of least restrictive means. See Board of Trustees, State Univ. of N.Y., 492 U.S. at 477-78. What is required, rather, is that “the regulation not ‘burden substantially more speech than is necessary to further the government’s legitimate interests.’ ” Id. at 478, quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989). There must be “a ‘fit’ between the legislature’s ends and the means chosen to accomplish those ends,’ ... a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is ‘in proportion to the interest served.’ ” Board of Trustees, 492 U.S. at 480, quoting Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341 (1986), and In re R.M.J., 455 U.S. 191, 203 (1982). In evaluating the “fit,” the Court has been “loath to second-guess the Government’s judgment,” relying on the state’s judgment “so long as its judgment was reasonable.” Board of Trustees, 492 U.S. at 479. That deference serves to “provide the Legislative and Executive Branches needed leeway in a field (commercial speech) ‘traditionally subject to governmental regulation.’ ” Id. at 480, quoting Ohralik, 436 U.S. at 455-56.
The burden to prove the fit between the regulation and the interest served is on the regulator. See Board of Trustees, 492 U.S. at 480. At the stage of a preliminary injunction, however, the Court is not in the position of evaluating evidence and making ultimate findings as it would do after trial, but is rather predicting the likelihood that the regulator will be able to make the required showing. In making that prediction, the Court can properly consider the longstanding and *419 widespread recognition, as expressed in the cases cited supra, of the importance of regulation of the offering and sale of securities in protecting the health of the capital markets and of the economy.
The Court also keeps in mind that the crux of the overall scheme established by both the state and federal securities laws is the requirement of registration. Registration serves not to restrict speech, but to expand it, by ensuring that any public offer to sell securities is accompanied by full disclosure of all material information. See Ralston Purina, 346 U.S. at 124 n.10 (quoting preamble to Federal Securities Act of 1933, “An Act to provide full and fair disclosure of the character of securities sold in interstate and foreign commerce . . . and to prevent frauds in the sale thereof’); see also Wall Street Pub. Inst., 851 F.2d at 372. Disclosure requirements “trench much more narrowly on an advertiser’s interests than do flat prohibitions on speech.” Zauderer, 471 U.S. at 651. For that reason, the high Court has held, “an advertiser’s rights are adequately protected as long as disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.” Id. See also Pharmaceutical Care Mgmt. Ass’n v. Rowe, 429 F.3d 294, 316 (1st Cir. 2005).
The necessary corollary to the registration and disclosure requirement is the prohibition of public offering of unregistered securities. Prohibitions on public offering inherently restrict speech. But without such prohibitions it is difficult to imagine how a registration and disclosure system could operate with any degree of effectiveness. See Kneeland, 280 Mass. at 377. Here, the particular regulatoiy order in issue sanctions advertising unregistered securities to the public, including to a Massachusetts resident not shown to be an accredited investor. The order fits directly within the longstanding norm of securities regulation that Courts have consistently accepted as permissible.
Bulldog emphasizes that its website did not provide a mechanism through which one could make an actual investment transaction, and that it has not and “would not” sell other than to investors who certify their accredited status. That may be so, but the State is not required simply to take Bulldog’s word for it. It is certainly reasonable to conclude that indiscriminate advertising to the general public tends to increase the likelihood of sales to ineligible persons, who may be persuaded to invest without the full information that registration would provide.
Bulldog suggests that the State could achieve its objective with less burden on speech by monitoring actual investments, including requiring documentation of eligibility, subject to audit by regulatory officials, or even by requiring verification by regulatory officials prior to investment transactions. How such a system would operate in practice is not apparent; at the least it would require that the issuer register with regulatory authorities, give notice of actual or proposed investments, and refrain from any transactions without registration and notice. The result would seem to be more, rather than less, burden on speech. A more fully developed record may lead to a different conclusion. At this stage, however, the Court is of the view that the regulatory order in issue here is reasonably proportional to the interests to be served by the regulatory scheme, and accordingly that the plaintiffs are not likely to succeed on the merits of their First Amendment claim.
As indicated supra, the plaintiffs’ supplemental memoranda adds a second theory, not identified in the complaint, that the Massachusetts regulations violate the Commerce Clause. They invoke the so-called “dormant” aspect of the Commerce Clause, which prohibits state regulation that “discriminates against or unduly burdens interstate commerce and thereby ‘impedes free private trade in the national marketplace.’ ” Gen. Motors Corp. v. Tracy, 519 U.S. 278, 287 (1997), quoting Reeves, Inc. v. Stake, 447 U.S. 429, 437 (1980). By analogy to cases addressing regulation of internet transmission of sexually explicit materials, plaintiffs argue that regulation of Bulldog’s website necessarily regulates commerce in other states. See American Booksellers Foundation v. Dean, 342 F.3d 96, 104 (2d Cir. 2003); PSINET, Inc. v. Chapman, 362 F.3d 227, 240 (4th Cir. 2004). Invoking the balancing test applied in those cases, they urge the Court to conclude that the burden on interstate commerce outweighs any benefit to Massachusetts residents from the regulation.
Plaintiffs’ theory fails, because neither the regulation itself nor the Secretary’s application of it in the final order attempts to regulate Bulldog’s website in and of itself. Rather, the final order is based on the combination of the website and the direct e-mail communication to a Massachusetts resident. As indicated supra, the regulation, 950 C.M.R. §14.02(b)(13), excludes internet offers not “directed toward any investor or group of investors in the Commonwealth.” The regulation establishes a presumption that an offer is not directed to residents if it “contains indications” that it is “not being made in jurisdictions where it is not registered or appropriately exempted.” The direct e-mail communication with Mr. Hickey rebutted that presumption.
Regulation of e-mail sent into a state has been held not to implicate the dormant Commerce Clause, where federal law authorizes state regulation in the area. See Beyond Systems, Inc. v. Keynetics, Inc., 422 F.Sup.2d 523, 531-35 (D.Md. 2006), and cases cited. Here, as in that case, Congress has expressly authorized state regulation in the field; 15 U.S.C. §77p(e) provides that state securities regulators “shall retain jurisdiction ... to investigate and bring enforcement actions.” See also Northeast Bancorp., Inc. v. Board of Governors, 472 U.S. 159, 174 (1985) (“When Congress so chooses, *420 state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause”).
Bulldog bases its argument not on the Secretary’s actual decision, but on recommended findings submitted to the hearing officer by the enforcement section, and on the theoretical possibility that at some time in the future the enforcement section would seek, and the Secretary would order, sanctions based on the website alone. In this respect, what Bulldog seeks is essentially an advisory opinion, on a matter of federal constitutional law not involving freedom of speech. Such relief is not available by means of a preliminary injunction. Bulldog has not established a likelihood of success on the merits of its claims. The Court therefore has no occasion to address the other aspects of the test for a preliminary injunction. The motion must be denied.
CONCLUSION AND ORDER
For the reasons stated, the Plaintiffs’ Motion for Preliminary Injunction is DENIED. The Court will conduct a status conference at the earliest available date to set a schedule for future proceedings; counsel are directed to confer with each other and then contact the clerk to set a date.

The Court draws background information from the final order issued by the Secretary of State on October 17, 2007, as well as from the complaint, affidavits, and attached materials submitted by the plaintiffs in support of their motion.

Form D refers to a filing under Rule 506 of SEC Regulation D. Under that rule, companies are permitted to raise unlimited funds through private offerings without registration, provided they follow certain requirements, including a restriction against general advertising or solicitation of offers to buy secundes. See 17 C.F.R. §§230.501-508. Massachusetts regulation 950 C.M.R. §14.402(B)(13)(I) requires compliance with that federal rule.

It appears, although the language of the complaint is less than clear on the point, that each is named solely in his official capacity.

The complaint does not include any prayer for monetary relief other than attorneys fees. The plaintiffs have recently moved for leave to file an amended complaint that would add claims for damages. The Court denies that motion in a separate order issued this date.

The defendants have not controverted the assertions in the plaintiffs’ affidavits.

Although the Court is informed that Bulldog has brought a separate action for judicial review of the final order pursuant to G.L.c. 30A, §14, Bulldog has not argued in this case that the final order is based on any error in interpretation or application of any state or federal statute or regulation, or on any erroneous factual finding. The Court therefore takes as established the Secretary’s ruling that Bulldog’s operation of the website, combined with the e-mail communication to Brendan Hickey, violated G.L.c. 110A and regulations under it, as well as corresponding federal regulations.

The defendants’ answers challenge Bioness’s standing, but not that of the list of parties referred to herein collectively as Bulldog. Under these circumstances, the Court need not determine Bioness’s standing at this stage. Mass. Redemption Coalition, Inc. v. Secretary of the Exec. Office of Envir. Affairs, 68 Mass.App.Ct. 67, 68 n.3 (2007), citing Mass. Teachers Ass’n v. Secretary of the Commonwealth, 384 Mass. 209, 214 (1981) (“[W]here at least one plaintiff has standing to raise issues before the court, the standing of other plaintiffs need not be addressed”).

he only argument the plaintiffs offer under the Massachusetts Declaration of Rights is the suggestion that “Article XVI . . . can and should be interpreted to provide greater protection to free speech than the First Amendment.” For this proposition the plaintiffs cite Mendoza v. Licensing Bd. of Fall River, 444 Mass. 188, 201 (2005), which applied Art. XVI to strike down a prohibition on nude dancing similar to one the United States Supreme Court had upheld under the First Amendment. The plaintiffs do not cite any Massachusetts authority relating to regulation of commercial speech, or speech in any area otherwise analogous to that involved here. Nor have they identified any case suggesting any other infirmity in the Massachusetts Securities Act under the Declaration of Rights. The Supreme Judicial Court long ago rejected a challenge to the statute under Article 12. See Kneeland v. Emerton, 280 Mass. 371, 383 (1932). The Court notes further that the facts presented here appear to fall short of the element of threats, intimidation or coercion required for a claim under the state civil rights act. See generally Haufler v. Zotos, 446 Mass. 489, 504-08 (2006), and cases cited.

The plaintiffs cite a line of cases applying First Amendment protections to publication of opinions by commentators and analysts who are not issuers of securities, and do not advise individual investors. E.g. Lowe v. S.E.C., 472 U.S. 181, 210 (1985); Commodity Trend Serv. v. Commodity Futures Trading Comm’n, 149 F.3d 679, 682 (7th Cir. 1998); S.E.C. v. Wall St. Pub. Inst., Inc., 851 F.2d 365, 373 (D.C. Cir. 1988); Taucher v. Born, 53 F.Sup.2d 464, 479-82 (D.C. 1999). These cases are inapposite, since they do not involve advertising of securities. Blount v. S.E.C., 61 F.3d 938, 939 (D.C. Cir. 1995), is similarly inapposite, involving regulation of campaign contributions.

A similar statement appears in the printable brochure that was accessible on the website.

Disclosure that might be pertinent would include, for example, exactly what is meant by “a significant portion of our net worth,” so as to enable a potential investor in Bulldog’s funds to evaluate the extent to which the interests of its advisors really are aligned with those of the investor.

Bulldog identifies the regulatory interest as preventing sales to unaccredited investors, and argues that the regulation does not address that interest directly, since it applies to communications that are remote from any such sale. This mistakes the interest at stake, which goes well beyond accredited investors. The registration requirement ensures fully informed decision making by investors generally, and thereby serves the broad interest in the integrity of the capital markets. Sales to accredited investors are a narrow exception to the registration requirement, under which unregistered securities may be sold privately, to a narrow and carefully selected category of purchasers, without the safeguards deemed necessary for the benefit of the public as a whole. Cf. Stamm v. Barclays Bank of New York, 960 F.Sup. 724, 733 (S.D.N.Y. 1997); 15 U.S.C. §77d(6). Bulldog’s website communications were addressed to the general public, not limited to accredited investors, as is reflected in its e-mail exchange with Mr. Hickey, conducted without any prior effort to ascertain his accredited status.