Fabricant, Judith, J.
INTRODUCTION
This action arises from activities of the Office of the Secretary of the Commonwealth in enforcing Massachusetts securities laws with respect to certain communications regarding hedge funds, particularly a website operated by the group of plaintiffs who will be referred to herein collectively as “Bulldog Investors,” or “Bulldog,” and associated e-mail communication. The plaintiffs contend that the Secretary’s enforcement activities have violated their rights under the First Amendment to the United States Constitution. This Court has issued two previous decisions in this action, one on the plaintiffs’ motion for preliminary injunction, dated December 21, 2007, and one on the defendant’s partial motion to dismiss, dated July 28, *187 2008.[2] After a jury-waived trial on July 31, 2009, the Court now enters the following findings of fact, rulings of law, and order for judgment.
BACKGROUND
The stipulation of the parties, along with exhibits admitted by stipulation, provide the following factual background. Plaintiff Bulldog Investors General Partnership is a general partnership. Three of its general partners are private investment partnerships known as hedge funds: the plaintiffs Opportunity Partners, L.P., Full Value Partners, L.P., and Opportunity Income Plus Fund, L.P. The fourth general partner, and managing partner, is the plaintiff Kimball & Winthrop, Inc., which is the sole general partner of Opportunity Partners. Plaintiffs Full Value Advisors, LLC, and Spar Advisors, LLC, are the sole general partner and investment advisor to Full Value Partners, and Opportunity Income Plus Fund, respectively. Plaintiffs Steven Sam-uels, Phillip Goldstein, Andrew Dakos, and RajeevDas are principals of one or more of the above-described entities. These entities and individuals will be referred to herein collectively as Bulldog Investors, or Bulldog. Bulldog Investors has not registered any offering of securities with the Securities and Exchange Commission (“SEC”). In 1992 and 2001, respectively, Opportunity Partners and Full Value Fund filed “Form D” with the SEC, claiming exemption from registration requirements.[3]
Plaintiff Leonard Bloness (“Bloness”), a resident of Sheffield, Massachusetts, is not affiliated with Bulldog Investors. Bloness desires to have access to information about Bulldog Investors, including the information conveyed through the communications in issue in this case. He does not intend to, and has never intended to or attempted to, invest in any Bulldog fund. Bloness is an accredited investor for the purposes of 17 C.F.R. §230.501(a).
From about June 9, 2005, to January 5, 2007, Bulldog Investors maintained an interactive website that provided information about the investment products it offered. The website made certain information available to any visitor, including press articles and a printable brochure describing Bulldog’s three investment vehicles, Opportunity Partners, Full Value Partners, and Opportunity Income Plus Fund. The brochure gave a brief summary of each fund’s approach. It described Opportunity Partners as “a highly diversified fund primarily invested in publicly-traded closed-end mutual funds and operating companies that are selling substantially below their intrinsic values . . . [that] applies the firm’s proprietary investment methodology to ‘unlock’ these values.” Full Value Partners was described as “a fund that concentrates on taking substantial positions in undervalued operating companies and closed-end mutual funds,” and that “acts as a catalyst to ‘unlock’ these values through proprietary means.” Income Plus Funds, according to the brochure, “is a low-risk fund that primarily invests in undervalued income producing closed-end funds, real estate investment trusts, and other investments . . . attempts to produce better current returns with less risk than is achievable in the bond markets . . . [and] anticipates compounding of capital in addition to generating high current income.” Each fund, the brochure stated, “will hedge when deemed appropriate.” A link on the site available to any visitor provided the statement that “Bulldog Investors has delivered a net average annual return significantly higher than that of the S&P 500 Index. Moreover Bulldog has performed especially well in difficult investment periods like 2000 through 2002.”
The website provided additional information to a visitor who would click “I Agree” to the following disclaimer:
The information is available for information purposes only and does not constitute solicitation as to any investment service or product and is not an invitation to subscribe for shares or units in any fund herein. For the avoidance of doubt this website may not be used for the purpose of an offer or solicitation in any jurisdiction or in any circumstances in which such offer or solicitation is unlawful or not authorized. Whilst every effort has been made to ensure the accuracy of the information herein, Bulldog Investors accepts no responsibility for the accuracy of information, nor the reasonableness of conclusions based upon such information, which has been obtained from third parties. The Rates referring specifically to investment products offered by Bulldog Investors are only available for view with a username and password, which can be obtained by contacting the company on the Registration Form provided. The value of investments and the income from them can fall as well as rise. Past performance is not a guarantee of future performance and investors may not get back the full amount invested. Changes in the rates of exchange may affect the value of investments.
A website visitor seeking more specific information about the funds and their performance could request such information by clicking on a button labeled “send feedback,” which would lead to a registration screen seeking personal identifying information, including the visitor’s address. To register, a visitor would be required to acknowledge having read and agreed to the foregoing disclaimer.
On November 10, 2006, Brendan Hickey (“Hickey”), registered on the Bulldog website, entering his Massachusetts address. Hickey was an employee of a law firm that was representing a client in litigation with Bulldog, and acted at the direction of his employer. He was not an accredited investor. Samuels responded to Hickey, by e-mail, attaching additional materials including information about the funds’ investment strategy and philosophy, the backgrounds of their *188 managers, performance and recent successes, and news articles. Samuels’s e-mail stated,
While we are proud to have one of the best long term records in the business, it is very difficult to adequately describe what, why, and how we do what we do in a quick response to an e-mail inquiry. Performance numbers for example show nothing of the risk taken to achieve those returns. I have attached some basic information on our management including performance and philosophy. I would be happy to spend a few minutes on the phone if you wish to discuss in more detail. Please contact me at [a telephone number provided).
Among the materials Samuels attached to his email to Hickey was a copy of a letter, dated July 13, 2006, directed to investors in Bulldog’s funds. The letter discussed the funds’ returns as compared to the Standard & Poor 500 Index, current investments in particular companies, and a lawsuit against the SEC challenging a rule requiring registration of certain hedge fund managers. It then stated:
We don’t need a nanny regulator to tell us right from wrong. And unlike most mutual fund managers, we put our money where our mouths are. Since day one a significant portion of our net worth has been invested in Full Value Partners so you can be sure that our interests are closely aligned with yours. In our opinion that is more important than all the cosmetic rules and regulations any regulator can dream up.
On January 31, 2007, the enforcement section of the Massachusetts Securities Division filed an administrative complaint with the Acting Director of the Securities Division against Bulldog, alleging that Bulldog had offered securities for sale in the Commonwealth that were not properly registered or exempt, in violation of G.L.c. 110A, the Massachusetts Uniform Securities Act, and regulations thereunder, 950 C.M.R. §10 et seq., by means of the communications appearing in the website. The enforcement section sought a cease and desist order, an administrative fine, and other relief. Bulldog answered the administrative complaint on February 21, 2007, denying the allegations and raising as a defense that the administrative complaint abridged its rights under the First Amendment to the United States Constitution.
On March 23, 2007, while the administrative proceeding was pending, the plaintiffs filed this action against the Secretary, seeking relief pursuant to 42 U.S.C. §1983 from the alleged violation of their First amendment Rights.[4] Contemporaneously with the filing of the Complaint, the plaintiffs moved for a preliminary injunction. The Court (Gants, J.) declined to hear the motion at that time, preferring to await the Secretary’s action on the pending administrative complaint. When the administrative complaint remained pending several months later, after proceedings on cross motions for summary disposition in the administrative forum, the plaintiffs here renewed their request for preliminary injunctive relief, and this Court set a briefing schedule and scheduled a hearing for October 23, 2007.
On October 17, 2006, the Acting Director of the Securities Division issued a final order, on behalf of the Secretary, concluding the administrative proceeding. The Secretary’s final order adopted the hearing officer’s findings of fact, consistent with the stipulated facts set forth supra, and her rulings of law, in substance, as follows. The Massachusetts Uniform Securities Act, G.L.c. 110A, §301, makes it unlawful for any person to offer securities for sale in the Commonwealth unless the securities are registered, the transaction is exempt, or the security is “federally covered.” The Act defines an offer to sell to include “every attempt or offer to dispose of or solicitation of an offer to buy a security or interest in a security for value.” G.L.c. 110A, §401(2). The Act further provides that it should be construed so as to coordinate its interpretation and administration consistently with federal securities law. G.L.c. 110A, §415. Under federal case law and SEC decisions, an offer extends beyond the common-law contract concept, to include information that “conditions the public interest in particular securities.” See SEC v. Cavanaugh, 155 F.3d 129, 135 (2d Cir. 1988); Carl M. Loeb, Rhodes & Co., 38 S.E.C. 843, 850 (1959).
Under that definition, the hearing officer ruled, “it is clear respondents have offered securities for sale in the Commonwealth,” by disseminating the information on the website, in combination with the e-mail communication directed to Mr. Hickey. Citing SEC decisions, the hearing officer rejected the contention that the website material did not constitute an offer because a visitor to the site who sought specific information about funds would have to register, indicating agreement to the disclaimer. The hearing officer went on to rule that Bulldog had not proved that it was exempt from registration requirements. The only exemption invoked was that under 950 C.M.R. §14.02(b)(13)(m), which exempts offers communicated through the internet if not “directed toward any investor or group of investors in the Commonwealth,” and presumes that such an offer is not so directed if it “contains indications that the offer is not being made in jurisdictions where it is not registered or appropriately exempted.” That exemption did not apply, the hearing officer ruled, because of the e-mail, with attached material, directed specifically at a Massachusetts resident. The hearing officer also ruled that Bulldog’s activities were not exempt under other specified regulatoiy provisions that condition exemption on compliance with a ban on general advertising. Based on those findings and rulings, the Securities Division ordered that Bulldog cease and desist from further violations, comply with the act, and pay an administrative fine of $25,000.
*189 This Court heard argument on the plaintiffs motion for preliminary injunction on October 23, 2007. After receiving supplemental briefs addressed to the Secretary’s final decision, the Court issued its decision on the motion on December 21, 2007. The Court denied the motion for preliminary injunction, concluding that the plaintiffs had failed to establish a likelihood of success on the merits.
In reaching that conclusion, the Court noted at the outset that the plaintiffs had not identified any court decision, at any level, striking down on First Amendment grounds any statute, regulation, or application of either with respect to the conduct of issuers in offering or advertising securities.[5] The Court noted further that the United States Supreme Court has, on a number of occasions, cited the securities area as an example of speech regulation that does not violate the First Amendment. See Dun & Bradstreet, Inc. v. Greenmoss Builders, 472 U.S. 749, 758 n.5 (1985); Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 456 (1978); Paris Adult Theater I v. Slaton, 413 U.S. 49, 64 (1973); see also National Association for Adv. of Psychoanalysis v. California. Bd. of Psych., 228 F.3d 1043, 1054 (9th Cir. 2000); Securities & Exchange Commission v. Wall Street Pub. Inst., Inc., 851 F.2d 365, 372-73 (D.C.Cir. 1988); Bangor & Aroostook R.R. Company v. Interstate Commerce Comm'n, 574 F.2d 1096, 1107 (1st Cir. 1978); European Connections & Tours, Inc. v. Gonzales, 480 F.Sup.2d 1355, 1370 (N.D.Ga. 2007); see generally Michael Siebecker, Corporate Speech, Securities Regulation, and an Institutional Approach to the First Amendment, 48 William & Mary L.Rev. 613, 618, 641-45 (2006).
The Court observed that although the Supreme Court’s comments on this subject were dicta, their repetition provided strong guidance to this Court in its task of predicting how appellate courts would resolve the question. See Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir. 2006); Harbury v. Dench, 233 F.3d 596, 604 (D.D.C. 2000).
The Court proceeded to determine the nature of the conduct affected by the regulation — that is, whether it is speech, and if so, what kind, commercial or non-commercial. The Court noted the plaintiffs’ contention that the communications in issue are non-commercial speech, because they do not propose any commercial transaction, and the defendant’s opposing contention that the conduct in issue is not speech at all, but is merely incidental to a regulable transaction, that is, the sale of securities. See Lowe, 472 U.S. at 232 (“offer and acceptance are communications incidental to the regulable transaction called a contract”). The Court rejected both arguments, relying on the content of the website materials and e-mail attachments to conclude that they were neither acts of offer and acceptance, in a direct contract sense, nor merely information about hedge funds in general or Bulldog funds in particular, but rather communications in the nature of advertising, calculated to generate interest in investment in Bulldog’s funds, directly analogous to the advertising in issue in Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, 425 U.S. 748, 762 (1976). On that basis, the Court concluded that the communications were commercial speech, in the sense that the expression is “related solely to the economic interests of the speaker and its audience.” Central Hudson Gas & Elec. v. Public Serv. Comm’n, 447 U.S. 557, 561 (1980). Accordingly, the Court applied the four-part test set forth in that decision to evaluate the validity of the Secretary’s enforcement of the Massachusetts statute and regulations.
With respect to the first prong of the test, the Court concluded that the speech provided truthful information about lawful activities — that is, operation of hedge funds, and investment in them. On the second prong, the Court identified the state interest advanced as justification for the regulatory scheme: to protect the integrity of capital markets, and thereby to preserve the overall health of the economy, by ensuring that investors make decisions based on full and accurate material information. The Court concluded that this interest is substantial, noting the catastrophic consequences of the absence of effective regulation manifested during the Great Depression, following which Congress enacted the Federal Securities Act of 1933, and states, including Massachusetts, enacted various corresponding provisions. See S.E.C. v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186-87 (1963); S.E.C. v. Ralston Purina Co., 346 U.S. 119, 124-25 (1953); In the matter of Carl M. Loeb, Rhoades & Co., 38 S.E.C. at 848; Smith v. Fishback, 123 S.W.2d 771, 778 (Tex.Civ.App. 1938); In re Leach, 215 Cal. 536, 543 (1932); Stewart v. Brady, 300 Ill. 425, 430 (1921); Kneeland v. Emerton, 280 Mass. at 387-88; see also Merrick v. Halsey & Co., 242 U.S. 568, 586-88 (1917); Hall v. Geiger-Jones Company, 242 U.S. 539, 539-40 (1916); compare G.L.c. 110A, §301 with 15 U.S.C. §77e; compare G.L.c. 110A, §101 with 15 U.S.C. §78(b); see also G.L.c. 110A, §302.
The Court then turned to the third and fourth prongs of the Central Hudson test, which, together, determine whether the regulation is “in proportion to that interest.” These prongs ask whether a challenged regulation directly advances the state interest, and whether the interest “could be served as well by a more limited restriction on commercial speech ...” 447 U.S. at 564. The Court concluded, based on the limited record available at the preliminary injunction stage, that the Secretary was likely to succeed in showing that the regulatory scheme satisfies both prongs. As to the third prong, the Court expressed the view that the statute and regulations serve the state’s interest directly by limiting solicitation of offers to those who have made full disclosure in connection with registration. See G.L.c. 110A, §301.
*190 The Court identified the fourth prong of the Central Hudson test as the most difficult to apply, but found it likely that the Secretary would succeed in showing “a ‘fit’ between the legislature’s ends and the means chosen to accomplish those ends, ... a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is ‘in proportion to the interest served.’ ” Board of Trustees of the St. Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1980), quoting Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico, 478 U.S. 328, 341 (1986), and In re R.M.J., 455 U.S. 191, 203 (1982). In reaching that conclusion, the Court noted particularly that the essence of the regulatory scheme was the requirement of disclosure, and that disclosure requirements “trench much more narrowly on an advertiser’s interests than do flat prohibitions on speech,” so that “an advertiser’s rights are adequately protected as long as disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.” Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 651 (1985). See also Pharmaceutical Care Mgmt. Ass’n v. Rowe, 429 F.3d 294, 316 (1st Cir. 2005). Based on these conclusions, the Court denied the motion for preliminary injunction.
After that ruling, the parties conducted discovery, exchanged information, and negotiated a comprehensive stipulation. In addition to the factual background as set forth supra, the parties stipulated to certain matters of mixed fact and law, and to certain limitations on the issues to be litigated. The parties agreed, for purposes of the Central Hudson test, that Bulldog’s communications through the combination of its website and the e-mail were not misleading and did not relate to any unlawful transaction. The parties also agreed that “it is a substantial state interest” of Massachusetts “to protect the integrity of capital markets, and thereby to preserve the overall health of the economy, by ensuring that investors make decisions based on full and accurate information.” Thus, the parties agreed, the only disputed issues under the Central Hudson test are the third and fourth prongs[6] whether the statute and regulations directly advance that interest, and whether they intrude on speech more than necessary to achieve the government’s interest. See Central Hudson, 447 U.S. at 564. The parties further stipulated that, for the purposes of determining whether the regulatory scheme is more intrusive than necessary, the Court need not consider any alternatives other than the eleven proposals suggested by Bulldog and set forth in the stipulation.[7]
The evidence at trial, held on July 31, 2009, consisted of a set of agreed exhibits, and the expert testimony of Professor Joseph Franco of Suffolk University Law School, a law professor with specialized training and experience in economics and securities regulation. Among the exhibits is an extensive written report of Professor Franco, expressing opinions consistent with his trial testimony, and addressing in detail each of the plaintiffs’ proposed alternatives. Professor Franco’s opinion, in substance, is that the regulatory scheme directly serves the identified governmental interest, and that none of the alternatives would do so as effectively.
FINDINGS, RULINGS, AND DISCUSSION
As a threshold matter, each side contends that it is entitled to judgment as a matter of law, without the need for any findings of fact, and without application of the Central Hudson test. The Secretary, as he did at the preliminary injunction stage, and citing the same authorities, argues that advertising of securities is not speech and does not implicate the first amendment at all. The Court rejects that contention for the same reasons stated in its preliminary injunction decision.[8]
The plaintiffs raise an argument the Court has not previously addressed. Citing LoriLlard Tobacco Co. v. Reilly, 533 U.S. 525, 561 (2001),[9] plaintiffs argue that, regardless of what facts might appear in the record with respect to the interest served by the regulatory scheme and the effectiveness of it in serving that interest, a court must strike down a regulation affecting speech unless the government shows that, prior to adopting the challenged regulation, the regulatory official actually conducted an evaluation of its effect on speech and weighed that effect against alternative, less restrictive methods to protect the governmental interest. Because the Secretary is unable to make such a showing, the plaintiffs argue, they are entitled to prevail.
The Court does not read LoriLlard, and the other cases cited, as establishing the rule the plaintiffs propose. Indeed, the Supreme Court did not actually apply such a standard in LoriLlard itself. Although the record there did not indicate that the Massachusetts Attorney General had actually conducted a cost benefit analysis before adopting the regulations, the Court did not treat that failure as determinative. Rather, the Court applied the standards established in Central Hudson to the evidentiary record developed in the litigation as justification for the regulations.[10] The Court applied the same type of analysis a year later in Thompson v. Western States Medical Center, 535 U.S. 357, 372 (2002), where it considered the legislative history of the statute underlying the challenged regulations, but also looked to the justification advanced in the evidentiary record developed in the course of the litigation, as well as justifications advanced in briefs before the Court. Indeed, plaintiffs have not identified any case in which a court has struck down regulations on the ground the plaintiffs urge this Court to apply, based solely on the government’s inability to prove that the regulatory authority actually engaged in a balancing process before adopting the regulations, without regard to evidence offered in the litigation as to the justification for the regulations.[11]
*191 The approach the courts have taken, in contrast to the one the plaintiffs propose, reflects the realities of the regulatory process at the state level, which may not involve recorded legislative or regulatory history of the sort compiled at the federal level. It reflects also the presumption of regularity that Courts properly grant to acts of the other branches. Further, the approach the Courts have applied avoids the formalistic results that would flow from rulings issued on the basis the plaintiffs propose.[12]
The Court therefore concludes, as it did at the preliminary injunction stage, that Central Hudson provides the test by which the Court must evaluate the Secretary’s action.[13] The first step in applying that test is to determine that the commercial speech at issue concerns lawful activity and is not misleading. Central Hudson, 447 U.S. at 564. Here, as stated supra, the parties have so stipulated.
If the communication is neither misleading nor related to unlawful activity, the government’s power is more circumscribed. The State must assert a substantial interest to be achieved by restrictions on commercial speech. Moreover, the regulatory technique must be in proportion to that interest. The limitation on expression must be designed carefully to achieve the State’s goal. Compliance with this requirement may be measured by two criteria. First, the restriction must directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government’s purpose. Second, if the governmental interest could be served as well by a more limited restriction on commercial speech, the excessive restrictions cannot survive.
Id. at 564. As indicated supra, the parties have stipulated to the second prong as well as the first: the governmental interest to be served by the regulations, “to protect the integrity of capital markets, and thereby to preserve the overall health of the economy, by ensuring that investors make decisions based on full and accurate material information,” is substantial. The dispute centers on the third and fourth prongs.
Before addressing the evidence relating to those issues, it bears noting that, what the parties and other courts have referred to as the third and fourth prongs are not so labeled in Central Hudson itself. Rather, Central Hudson refers to these as criteria by which to measure compliance with the requirement of proportionality. As the Supreme Court said, “the regulatory technique must be in proportion to [the substantial state interest asserted]. The limitation on expression must be designed carefully to achieve the State’s goal.” The so-called third and fourth prongs are not independent requirements, to be applied mechanically; they are a means of evaluating the proportional relationship between the challenged regulation and the substantial interest it seeks to serve.
The so-called third prong requires that the restriction “directly advance the state interest involved; the regulation may not be sustained if it provides only ineffective or remote support for the government’s purpose.” The plaintiffs seize on the word “directly” to argue that the relationship between the regulation and its purpose must be direct in a literal sense, in that the effectiveness of the regulation to achieve its goals does not depend on any intermediate steps or incentives. The Court does not adopt that interpretation, which is not supported either by the language of Central Hudson or by any other identified authority. Central Hudson explains the meaning of “direct”: “the regulation may not be sustained if it provides only ineffective or remote support for the government’s purpose.” The requirement of direct support obligates the government to show that the challenged regulation will not only advance the government’s stated interest, “but also that it will do so ‘to a material degree.’ ” 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 505 (1996), quoting Edenfield v. Fane, 507 U.S. 761, 771 (1993). See also Greater New Orleans Broadcasting Ass'n, Inc. v. United States, 527 U.S. 173, 188 (1999) (the third prong of the Central Hudson inquiry “is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree”).
To establish the effectiveness of the regulatory scheme in issue here, the Secretary has offered the expert opinion of Professor Franco. Having considered Professor Franco’s credentials, his reasoning, and his demeanor, the Court finds his opinions well-founded and highly credible, and adopts them in substance. On the issue of effectiveness, Professor Franco emphasizes that the ban on general advertising of unregistered securities must be considered in conjunction with the general requirement of registration, which mandates disclosure of all material information about securities offered to the public. The public filing of a registration statement, conforming in both form and content to uniform regulatory requirements, serves to provide complete, balanced, and accurate information not only to those who might consider investing in a particular offering, but also to the public as a whole, including regulatory officials, private analysts, large investors, and the news media, whose review serves as a powerful check on the accuracy and completeness of the information provided. That process tends to result in market prices that accurately reflect value, for the benefit of all investors, both those purchasing the particular issue and those trading in other securities. The ban on general advertising of unregistered securities, Professor Franco opines, provides a powerful incentive for issuers to register, despite the substantial costs of doing so, thereby maximizing the benefits of the registration system to the public as a whole; indeed, in his view, it is vital to the effectiveness *192 of the registration system. The Court adopts this opinion, and so finds.[14] It follows that the ban on general solicitation of unregistered securities effectively promotes registration, which, in turn, effectively serves the state interest in market integrity. Professor Franco does not purport to quantify the effectiveness of the regulatoiy scheme, and the Court is not in a position to do so. The case law does not establish a precise level of effectiveness that must be achieved; Central Hudson indicates only that the regulation must effect something more than “remote” support for the state interest served. The Court is satisfied that that standard is met here.
The Court therefore turns to the fourth prong of the Central Hudson Test: whether “the governmental interest could be served as well by a more limited restriction on commercial speech.” The phrase “as well” bears noting; the test is not whether some less restrictive approach might also serve the state’s interest, but whether it would do so as well as the challenged regulation. Central Hudson does not elaborate on what is meant by “as well.” The Court construes the phrase as referring to effectiveness in relation to the cost and burden of the regulatory scheme to the public — that is, could a less restrictive regulatory approach serve the state interest as effectively, at the same or approximately the same cost, both in public resources expended for administration and enforcement, and in private resources required for compliance?
To satisfy the fourth prong of the Central Hudson inquiry, the government must show “a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served, that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.” Florida Bar v. Went for It, 515 U.S. at 632. In evaluating the “fit,” courts have been “loath to second-guess the Government’s judgment,” relying on the state’s judgment “so long as its judgment was reasonable.” Board of Trustees, 492 U.S. at 479. That deference serves to “provide the Legislative and Executive Branches needed leeway in a field (commercial speech) ‘traditionally subject to governmental regulation.’ ” Id. at 480, quoting Ohralik, 436 U. S. at 455-56. See Board of Trustees, 492 U.S. at 480-81 (“By declining to impose . . . a least-restrictive-means requirement, we take account of the difficulty of establishing with precision the point at which restrictions become more restrictive than their objective requires, and provide the Legislative and Executive branches needed leeway in a field . . . traditionally subject to governmental regulation”).
“A regulation need not be absolutely the least severe that will achieve the desired end, but if there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech, that is certainly a relevant consideration in determining whether the fit between ends and means is reasonable.” Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417 n. 13 (1993) (internal quotation omitted). “(I]f the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so.” Thompson v. Western States Med. Ctr., 535 U.S. at 371; see Lorillard Tobacco Co., 533 U.S. at 566. What is required is that “the regulation not ‘burden substantially more speech than is necessary to further the government’s legitimate interests.’ ” Board of Trustees, 492 U.S. at 478, quoting Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989).
The Court also keeps in mind that the crux of the overall scheme established by both the state and federal securities laws is the requirement of registration. Registration serves not to restrict speech, but to expand it, by ensuring that any public offer to sell securities is accompanied by full disclosure of all material information. See Ralston Purina, 346 U.S. at 124 n.10 (quoting preamble to Federal Securities Act of 1933, “An Act to provide full and fair disclosure of the character of securities sold in interstate and foreign commerce . . . and to prevent frauds in the sale thereof’); see also Wall Street Pub. Inst., 851 F.2d at 372. Disclosure requirements “trench much more narrowly on an advertiser’s interests than do flat prohibitions on speech.” Zauderer, 471 U.S. at 651. For that reason, the high Court has held, “an advertiser’s rights are adequately protected as long as disclosure requirements are reasonably related to the State’s interest in preventing deception of consumers.” Id. See Florida Bar v. Went for It, 515 U.S. at 634 (remarking on the “many alternative channels” available to commercial speakers).
To evaluate the eleven alternative approaches the plaintiffs propose, the Secretary again offers Professor Franco’s opinions. As Professor Franco explained, the plaintiffs’ proposals overlap. All of them would eliminate the prohibition on general advertising of unregistered securities. Some would replace it with provisions of various kinds that would focus on the point of sale, such as requirements of notice of sales to the Secretary of State and of a right to rescind within a specified time; increased requirements of verification, documentation and record keeping to confirm accredited status of purchasers; licensing of accredited investors; and the like. Others offer no regulatory replacement, proposing merely more intensive enforcement of anti-fraud prohibitions or of prohibitions on sales to unaccredited investors.
In Professor Franco’s view, all of the plaintiffs’ proposals would reduce the incentive to register, and encourage issuers to make unregistered offerings, sacrificing lawful access to some potential buyers in favor of saving the costs of registration. In addition, all of the proposals would likely result in increased “dis- *193 tortive” (that is, unbalanced) communications, increased incidence of unlawful transactions (such as sales to unaccredited investors), and proliferation of scams. Those proposals that rely on increased enforcement activity in connection with sales would suffer from the problem of coming after, rather than before transactions, when dissipation of assets may prevent effective remedies. In addition, proposals requiring increased enforcement, to be effective, would require expenditure of increased public resources. Some would also raise issues of federal preemption, to the extent that they are inconsistent with the existing federal scheme of securities regulation. In all of these respects, Professor Franco opined, the plaintiffs’ proposals would decrease the protection of investors and impair market integrity. For the reasons already explained, the Court credits Professor Franco’s opinions. On that basis, the Court finds that none of the proposed alternatives would serve the governmental interest in market integrity as well as the existing regulatory scheme.
To counter Professor Franco’s opinions, the plaintiffs rely on two documents, submitted as stipulated exhibits at trial: A report to the Securities and Exchange Commission (SEC) from its Advisory Committee on Smaller Public Companies, dated April 23, 2006; and a letter to the SEC, dated April 3, 2006, from the Committee on Securities Regulation of the New York City Bar, commenting on an “exposure draft” of that report. The Advisory Committee Report recommends to the SEC that it relax prohibitions on general solicitation and advertising in certain respects. The New York City Bar expresses support for that recommendation.[15] Both documents identify the rationale and purpose for the authors’ position as the promotion of capital formation.
Capital formation is, of course, an important goal, which is to some degree in tension with investor protection and market integrity. Regulatory constraints that protect market integrity impose burdens on issuers and sellers of securities. In that respect, they may tend to impede capital formation. It follows that relaxation of such regulatory restraints might ease capital formation. The state regulatory scheme in issue here, and the corresponding federal scheme, reflect a regulatoiy choice to emphasize market integrity over capital formation. This Court has no authority to second-guess that choice. Rather, once it has been established (as it has been here by stipulation), that the interest the regulator seeks to serve is a substantial one, the Court’s role is to determine whether the means the Secretary has chosen to effectuate that choice is proportional to that interest, as measured by the criteria articulated in Central Hudson. Neither the Advisoiy Committee’s report nor the New York City Bar’s letter purports to address that issue, and neither sheds any light on it.
The Court concludes, based on the stipulated facts and the evidence presented at trial, that the statute and regulations in issue, and the Secretary’s enforcement action against Bulldog Investors, meet the test of Central Hudson, and do not violate the First Amendment rights either of Bulldog or of Mr. Bioness. A declaration will enter to that effect.
CONCLUSION AND ORDER
For the reasons stated, the Court orders that JUDGMENT enter for the defendant, declaring that the challenged statute, regulations and enforcement action do not violate the plaintiffs’ rights under the First Amendment. Counsel are directed to submit a proposed form of Judgment forthwith.

The Court has also issued a memorandum of decision and entered final judgment in a related action, no. 07-05038-BLS2, the plaintiffs’ petition for judicial review of the Secretary’s final decision pursuant to G.L.c. 30A, §14. Plaintiffs’ appeal from the judgment in that case is now pending before the Appeals Court.

Form D refers to a filing under Rule 506 of SEC Regulation D. Under that mle, companies are permitted to raise unlimited funds through private offerings without registration, provided they follow certain requirements, including selling only to so-called “accredited investors,” and refraining from general advertising or solicitation of offers to buy securities. Accredited investors are those whose income or assets exceed levels specified by regulation. See 17 C.F.R. §§230.501-08. Massachusetts regulation 950 C.M.R. §14.402(B)(13)(I) requires compliance with Rule 506.

The original complaint also named Patrick Ahearn, the Chief of Enforcement, asserted a claim under G.L.c. 12, §1II, and alleged that the Secretary’s action violated the plaintiffs’ rights under the Massachusetts Declaration of Rights and under the Commerce Clause of the United States Constitution, as well as the First Amendment. The plaintiffs’ amended complaint, filed on March 28,2008, names only the Secretary. The plaintiffs no longer press either the Commerce Clause claim or any claim under Massachusetts law in this action.

Ihe Court noted and distinguished the line of cases applying First Amendment protections to publication of opinions by commentators and analysts who are not issuers of securities, and do not advise individual investors. E.g. Lowe v. S.E.C., 472 U. S. 181, 210 (1985); Commodity Trend Serv. v. Commodity Futures Trading Comm'n, 149 F.3d 679, 682 (7th Cir. 1998); S.E.C. v. Wall St. Pub. Inst., Inc., 851 F.2d 365, 373 (D.C.Cir.1988); Toucher v. Born, 53 F.Sup.2d 464, 479-82 (D. C. 1999). The Court also distinguished Blount v. S.E.C., 61 F.3d 938, 939 (D.C.Cir. 1995), involving regulation of campaign contributions.

Both sides reserved the right to argue, and do argue on different grounds, that the Court should not apply the Central Hudson test.

Bulldog's suggested alternatives, as set forth in the Stipulations of Fact, are as follows:
(a) regulate unregistered securities transactions (e.g., by imposing eligibility requirements to invest, by requiring the issuer to make disclosures, or by imposing other requirements) as of the time of sale of the unregistered securities by an issuer, rather than as preconditions to the issuer making information about the unregistered securi *194 ties available to the public; (b) require issuers (and re-sellers) of unregistered securities to examine and keep records of financial documentation such as tax returns and net worth statements submitted by prospective investors in order to verify that they are eligible investors within the meaning of 17 CFR 230.501(a)(5)-(6), 17 CFR 230.506 (including 230.506(b)(2)(ii)), and 950 CMR 14.402(B)(13)(i) and (1), as they incorporate 17 CFR 230.506, who can fend for themselves with respect to the proposed unregistered securities transaction prior to or at the point of sale of securities, rather than prior to making information available to the public; (c) require a person who intends to invest in unregistered securities to be licensed as an eligible investor within the meaning of 17 CFR 230.501(a)(5)-(6), 17 CFR 230.506 (including 230.506(b)(2)(ii)), and 950 CMR 14.402(B)(13)(i) and (1), as they incorporate 17 CFR 230.506, by complying with standards set by regulation and require issuers of unregistered securities to verify that a prospective investor is licensed to invest in unregistered securities at the time a person invests in the issuer’s unregistered securities; (d) with respect to unregistered securities, limit the definition of an “offer" under the securities law to “an expression of willingness to contract on certain terms, made with the intention that it shall become binding as soon as it is accepted by the person to whom it is addressed, the "offeree;"
(e) require a professional intermediary such as an NASD-licensed broker-dealer or a certified financial adviser or planner to certify that he or she has determined that the investor is an eligible investor who understands and can bear the risk of the purchase of the particular unregistered securities before an unregistered securities transaction involving that investor occurs; (f) require issuers (and re-sellers) of unregistered securities to report to the Secretary not later than a waiting period set by regulation each proposed unregistered securities investment by a Massachusetts resident and provide that either the Secretary or the prospective investor, or both, may cancel the transaction during said waiting period for reasons to be established by regulation; (g) require issuers (and re-sellers) of unregistered securities to report each actual investment by a Massachusetts resident to the Secretary within ten days of the transaction; (h) permit a Massachusetts investor to rescind his purchase if an issuer (or re-seller) sells unregistered securities without complying with requirements (a) through (c) and (e) through (g); (i) prohibit the sale or resale of unregistered securities to Massachusetts residents; (]) fully and effectively enforce all of the existing laws and regulations prohibiting and remedying fraud and increase penalties for violations; and (k) fully and effectively enforce all of the existing laws and regulations regarding who is eligible and who is ineligible to invest in unregistered securities and increase penalties for violations.

As a first fallback position, the Secretary urges the Court to apply a rational basis test, on the theory that the regulatory scheme does not restrict speech, but instead merely compels disclosure. The Secretary cites Zauderer, 471 U.S. at 650-53, and Nat'l Elec. Mfrs. Ass’n v. Sorrell, 272 F. 3d 104, 113-16 (2nd Cir. 2001). As will be discussed further infra, the regulatory scheme in issue here is principally one of disclosure rather than restraint, and that overall characteristic certainly bears on the Court's evaluation of its effect on speech. Nevertheless, in the Court’s view, the regulatory scheme does restrict speech to a degree that requires more than a rational basis analysis.

The plaintiffs focus on this language in Lorillard, 533 U.S. at 561; “ The broad sweep of the regulations indicates that the Attorney General did not ‘carefully calculate the costs and benefits associated with the burden on speech imposed’ by the regulations. Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417 (1993).”

Noteworthy in particular is the Court’s evaluation of evidence the Attorney General had offered in the form of studies conducted by the Food and Drug Administration in connection with regulations it had proposed. Although the Court deemed those studies inadequate to show a fit between the Massachusetts regulations and the interest the Massachusetts Attorney General sought to serve, it did not suggest that anything turned on the question of whether the Attorney General had actually considered those studies, or other evidence, before adopting the regulation. Lorillard, 533 U.S. at 562.

The plaintiffs cite Utah Licensed Bev. Ass’n v. Leavitt, 256 F.3d 1061, 1075 (10th Cir. 2001). The Court in that case, like the Supreme Court in Lorillard and Thompson, considered the full record of evidence developed during the litigation to justify the regulation.

Here, for example, the plaintiffs’ theory would require the Court to strike down a statute and regulations that have been in effect for decades because the Secretary is unable to show that his long-ago predecessor engaged in a particular thought process at the time of enactment. Thereafter, the Secretary could proceed to conduct and document the required analysis, and then adopt the same regulations, which would then withstand challenge if, at trial, the Commonwealth could prove facts sufficient meet the Central Hudson test. Such an artificial exercise would do little to protect First Amendment interests, while severely undermining the interests the regulatory scheme serves.

Courts at all levels have applied the Central Hudsontest to regulation of commercial speech with dependable regularity for nearly three decades. See e.g., Thompson v. Western States Med. Ctr, 535 U.S. at 367, and cases cited; El Dia, Inc. v. Puerto Rico Dept. of Consumer Affairs, 413 F.3d 110, 115 (1st Cir. 2005).

As the plaintiffs point out, Professor Franco’s opinion is based not on empirical research, but on economic theory and regulatory experience. Nothing in Central Hudson, or in any other authority cited, requires evidence derived from empirical research. See Lorillard, 533 U.S. at 555, quoting Florida Barv. Went For It, Inc., 515 U.S. 618, 628 (1995) (“we have permitted litigants ... even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and ‘simple common sense’ ”). Nor is it apparent how such research could be conducted by any practical means with respect to' the regulations in issue here, without the risk of substantial harm that would arise from wholesale dismantling of the existing regulatory system.

Among its arguments, the Bar letter includes the following statement: “The North American Securities Administrators Association, Inc. has adopted a resolution relating to Internet offers of securities and a model accredited investor exemption (’MAIE’) each of which permits general solicitation and advertising... As of January 2006, thirty-one states had adopted the MAIE or a similar provision. It appears that these states have determined that permitting at least some form of general solicitation and advertising is not necessarily contrary to investor protection." The record before this Court provides no further information on the MAIE resolution or on the provisions adopted by other states in response to it. The Court is not in a position to compare whatever changes have occurred in the laws of other states with current Massachusetts law, and does not draw any conclusion based on this statement in the Bar letter.